*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0326p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　　*Plaintiff-Appellee,*

　　　　v.

JOSHSHAN CHILDS (07-1495); JEREMIAH JAPETH
SIMS (07-1597),

　　　　　　*Defendants-Appellants.*

Nos. 07-1495/1597

>

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 05-00160—Robert Holmes Bell, Chief District Judge.

Argued: July 31, 2008

Decided and Filed: August 29, 2008

Before: KENNEDY, GILMAN, and GIBBONS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Paul L. Mitchell, MITCHELL & ZAMBON, P.C., Grand Rapids, Michigan, Frank Harrison Reynolds, REYNOLDS LAW FIRM, Lansing, Michigan, for Appellants. Brian K. Delaney, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Paul L. Mitchell, MITCHELL & ZAMBON, P.C., Grand Rapids, Michigan, Frank Harrison Reynolds, REYNOLDS LAW FIRM, Lansing, Michigan, for Appellants. Brian K. Delaney, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

KENNEDY, Circuit Judge. Defendants Jeremiah Sims and Joshshan Childs appeal their convictions for conspiracy to commit murder for hire resulting in the death of Chrissy Satterfield in violation of 18 U.S.C. §§ 1958(a) and 2. Defendant Joshshan Childs also appeals his conviction for the underlying substantive offense of murder for hire. Sims raises four arguments on appeal: (1) the district court erred when it denied his Rule 29 motion for acquittal; (2) the district court erred in allowing Jackie Love to testify to an out-of-court statement made by indicted co-conspirator Carolyn Ross; (3) the district court improperly required him to testify under a statutory grant of use immunity at his co-defendant's trial; and (4) the district court erred when it failed to order Childs, over his attorney's objections, to submit to a pre-testimony interview by Sims' attorney. In his sole

1

argument, Childs argues that the district court erred in denying his mistrial motion based on the government's allegedly improper questioning of him at trial in violation of the Fifth Amendment. Because we find that the district court did not err on any of these grounds, we **AFFIRM** both defendants' convictions.

## BACKGROUND

Shortly after midnight on August 5, 1996, sixteen-year-old Chrissy Satterfield was murdered while taking a shower at her grandmother's house in Benton Township, Michigan. Satterfield was shot multiple times by someone standing on an overturned garbage can outside of the bathroom window.

Chrissy's uncle, Elmer Satterfield, heard the gunshots and saw two men jumping the side fence and running from the residence. A neighbor also heard the gunshots and saw two unidentified young black males dressed in dark clothing running from the area. Police officers responding to the scene recovered identifiable fingerprints located on the outside window ledge of the bathroom.

The case remained dormant, with few leads, until late 2001. At that time, Doreen Dortch came forward and related that the day after the murder, she overheard a conversation between her nephew, Joshshan Childs, and Jeremiah Sims, in which they discussed their involvement in the murder of Chrissy Satterfield. Based on this new information, the FBI submitted the known prints of Childs and Sims to the crime lab for comparison against the prints recovered from the murder scene. This comparison resulted in a positive fingerprints match with Childs.

In the course of the ensuing investigation, investigators contacted Jackie Love, Childs' former girlfriend. Love testified that while at a pool party during the summer of 1996, her cousin, Carolyn Ross, asked her if she knew anyone who could kill someone for her. Both Childs and Sims were present. Love testified that she initially thought Ross was joking. Later, Childs asked her if Ross was serious about having a murder committed because he might know someone who would do it.

A few weeks later, Ross again approached Love and Childs. Ross was very upset over her husband's affair with Chrissy Satterfield. Ross asked both if they would kill her husband and Chrissy Satterfield in exchange for money. A price was agreed upon. Later, Love and Childs visited the restaurant where Satterfield worked so that Childs could see what Satterfield looked like.

Shortly after this discussion, Love and Childs moved to Atlanta, Georgia. Throughout the summer, Love and Childs traveled back to Benton Harbor, Michigan about every other week to visit friends and relatives and to pick up SSI checks for Love's children. On one of these trips in mid-July of 1996, Childs and Love conducted a surveillance of the Satterfield residence.

On August 3, 1996, Love, Childs, and her children checked into a motel in Benton Harbor. Childs met Sims at the motel that night, and Love saw Sims playing with a gun. Sims spent the night at the same motel. The following day, they all went to spend the day visiting relatives. Love testified that at some point later that night she had not seen Childs in awhile.

Sometime after midnight on August 5, 1996, Love testified that she heard sirens and saw an ambulance and fire truck racing by. One of her cousins, a sister of Carolyn Ross, informed her that Chrissy had been shot. About a half hour later, Childs returned dressed in black clothing and told Love that he needed to be with people.

Later that same day, Love and Childs checked out of the motel and met Ross at a clothing store Ross owned. Love testified that she learned on the drive back to Atlanta that Ross had given Childs a large sum of cash at the store.

After receiving payment, Childs drove himself and Love to a nearby apartment complex and picked up Sims. Tonia Childs, Defendant Child's sister, saw them and Sims remarked that "we done fucked somebody up." Defendants, along with Love and her children, then left Michigan together.

After they returned to Atlanta, Sims stayed with Childs and Love until he was arrested on August 16, 1996, during a traffic stop on an outstanding warrant. Childs later confided in Love that he murdered Chrissy Satterfield and provided specific details, including how he stood on a garbage can and shot her multiple times through the bathroom window.

Investigators also interviewed both Childs and Sims about the murder and they gave conflicting accounts. Based on the information gathered, on June 29, 2005, a federal grand jury returned a two-count indictment against Childs and Sims, charging them both with conspiracy to commit murder for hire resulting in the death of Chrissy Satterfield and the underlying offense of murder for hire. Because Sims' prior statements to both law enforcement officers and the federal grand jury inculpated both Childs and Sims, on November 9, 2006, the district court severed their trials due to confrontation concerns.

Childs was tried first. The government granted Sims use and derivative use immunity pursuant to 18 U.S.C. §§ 6002 and 6003 and sought to compel him to testify at Childs' trial. Sims opposed the motion to compel his testimony, but the district court rejected his arguments and entered a compulsion order on January 5, 2007. At trial, Sims took the stand as ordered, but provided trial testimony that was wholly contradictory to the statements he had previously given to law enforcement officers and before the grand jury. Excerpts of Sims' grand jury testimony were then entered into evidence.[1]

Childs also testified on his own behalf at his trial. On the stand, Childs admitted that he lied to the law enforcement officers who interviewed him in jail about the Satterfield murder. He also admitted that following the interview he immediately attempted to contact Jackie Love through relatives to have her falsely deny that she and Childs were in Benton Harbor at the time of the homicide. Childs denied shooting Chrissy Satterfield.

On January 12, 2007, the jury convicted Defendant Joshshan Childs on both counts of the indictment.

On January 25, 2007, Carolyn Ross and Jeremiah Sims were named in a two-count superseding indictment, charging them both with conspiracy to commit murder for hire resulting in the death of Chrissy Satterfield and charging Ross only with the underlying substantive offense of murder for hire. Defendants' trials were also severed.

Sims did not testify at his own trial. Childs, however, voluntarily agreed, against the advice of counsel for both Sims and Childs, to testify on behalf of Sims. On the stand, Childs admitted that he shot and killed Chrissy Satterfield, but claimed that no one was with him when he committed the murder. He testified that he stood on a trash can and shot her through the bathroom window. Childs also claimed that Jackie Love drove him to the location and waited in the car while he committed the murder.

---

[1] We note that Sims' immunized testimony was not used during his own trial, nor has Sims been charged with perjury for his trial or grand jury testimony.

On cross-examination, Childs admitted that he lied repeatedly, including under oath at his own trial. He also testified that all of Sims' prior statements given to police and before the grand jury were lies.

On February 9, 2007, the jury found Sims guilty of the crime charged.

Both Childs and Sims were sentenced to life in prison. They now timely appeal their convictions.

## ANALYSIS

### I.

Defendant Sims first argues that the district court erred when it denied his Rule 29 motion for acquittal. Sims asserts that there was insufficient evidence to indicate he was part of a conspiracy to commit murder for hire resulting in the death of Chrissy Satterfield. We disagree.

In reviewing the sufficiency of the evidence, we must uphold a jury verdict if, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). However, "where, as here, a defendant does not renew his motion for judgment of acquittal for insufficiency of the evidence at the close of all the proofs, appellate review is limited to determining whether there was a 'manifest miscarriage of justice.'" *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998). Such a miscarriage of justice occurs only if the record is devoid of evidence pointing to guilt. *Id.* The record reflects that Sims raised a Rule 29 challenge to the sufficiency of the evidence at the conclusion of the government's case, but he failed to renew that motion at the close of all the evidence. Thus, we will not disturb Sims' conviction unless a manifest miscarriage of justice would result from a record devoid of evidence indicating guilt.

We find that the jury's guilty verdict was supported by ample evidence of Sims' involvement in the conspiracy to murder Chrissy Satterfield. Such evidence included testimony by Doreen Dortch regarding an incriminating conversation between Sims and Childs, the testimony of two witnesses that they saw two men running from the scene of the murder, Sims' own statements to law enforcement officers admitting that he was with Childs on the night of the murder, in possession of a gun, and had moved a garbage can to the side of the Satterfield residence at Childs' direction, and the testimony of Bradley Smit, an inmate with Sims in a local county jail, revealing that Sims had confided in him that he had received $2,000 for his role in the murder his cousin had set up and that he feared his fingerprints might be found on a bathroom window ledge and on a garbage can placed under the window. The record is certainly not devoid of evidence pointing to Sims' guilt of conspiring to murder Chrissy Satterfield in exchange for money.

### II.

Defendant Sims next claims that the district court committed reversible error by allowing Jackie Love to testify that Carolyn Ross asked her, in the presence of both Sims and Childs, if she knew anyone who could kill someone for her. Sims contends that this is inadmissible hearsay. We disagree.

The district court admitted the testimony as non-hearsay under Federal Rule of Evidence 801(d)(2)(E). That rule deems a statement not to be hearsay if "[t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Before admitting the out-of-court statements of co-conspirators pursuant to Rule 801(d)(2)(E), the district court must find that "it is more likely than not that the declarant and the

defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." *United States v. Enright*, 579 F.2d 980, 986 (6th Cir. 1978). We review for clear error the predicate factual determinations (1) that a conspiracy existed, (2) that the defendant against whom the statement is offered was a member of the conspiracy, and (3) that the hearsay statement was made in the course of and in furtherance of the conspiracy. *United States v. Gessa*, 971 F.2d 1257, 1261 (6th Cir. 1992) (en banc). We review the district court's legal conclusion, based on these factual determinations, that Rule 801(d)(2)(E) permitted the otherwise hearsay statements to be received as non-hearsay *de novo*. *Id*.

Sims argues that the district court erred in allowing Jackie Love to testify about an out-of-court statement made by indicted co-conspirator Carolyn Ross at a time when Sims was not a member of the conspiracy and at a time when the conspiracy itself did not yet exist. But the requirement that out-of-court declarations by a co-conspirator be shown to have been made while the conspiracy is in progress arises only because the declaration would otherwise be hearsay. We find that Jackie Love's testimony is not hearsay at all.

"Hearsay" is defined by the Federal Rules of Evidence as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). A "declarant" is one who makes a "statement," and words qualify as a "statement" only if they make an "assertion." FED. R. EVID. 801(b), (a). "A witness who testifies at trial that [someone solicited them to commit a crime] is testifying to a verbal act of which the witness has direct knowledge: the extension of the invitation." *United States v. Gordon*, No. 90-1501, 1991 WL 108723, at *3 (6th Cir. June 20, 1991). The words allegedly spoken by the solicitor are not a "statement" because they do not constitute an "assertion." *Id*. Thus, Jackie Love's testimony that Carolyn Ross asked her if she knew anyone who could kill someone for her is admissible evidence of a verbal act. It is the fact that the declaration was made, and not the truth of the declaration, which is relevant. We therefore find that the district court did not err in admitting Jackie Love's testimony over Sims' objection. *See Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.*, 772 F.2d 214, 216 (6th Cir. 1985) ("A decision below must be affirmed if correct for any reason, including a reason not considered by the lower court.").

Moreover, even if we were to find that the district court erred in admitting the statement into evidence, any such error was harmless. We have held that "an error by a district court with respect to the admission of evidence is subject to harmless error analysis, and it is well settled that an error which is not of a constitutional dimension is harmless unless it is more probable than not that the error materially affected the verdict." *United States v. Daniel*, 134 F.3d 1259, 1262 (6th Cir. 1998). Here, we find it more probable than not that the jury would have reached the same verdict based on other evidence of Sims' involvement in the conspiracy to murder Chrissy Sattersfield properly admitted at trial, without regard to Jackie Love's testimony that Carolyn Ross asked her if she knew anyone who could kill someone for her – especially since these statements did not even inculpate Sims.

## III.

Defendant Sims also argues that his conviction should be vacated because he was improperly required to provide testimony under a statutory grant of use and derivative use immunity at his co-defendant's trial. Sims argues that Congress could not have intended for the statute to apply to a situation, such as his, in which an indicted defendant is compelled to testify at his co-defendant's trial some three weeks before his own trial for the same offense.

In *Kastigar v. United States*, 406 U.S. 441, 446 (1972), the Supreme Court explained that "[t]he existence of [immunity] statutes reflects the importance of testimony, and the fact that many offenses are of such a character that the only persons capable of giving useful testimony are those

implicated in the crime."   In that case, the Court determined that the immunity from use and derivative use under 18 U.S.C. § 6002 is "coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of privilege." *Id*. at 453. This is because the statute "affords the same protection [as the privilege against self-incrimination] by assuring that the compelled testimony can in no way lead to the infliction of criminal penalties." *Id*. at 461.

However, "[t]he statute, like the Fifth Amendment, grants neither pardon nor amnesty.  Both the statute and the Fifth Amendment allow the government to prosecute using evidence from legitimate independent sources." *Id*.  In order to enforce the protections of the statute in any future proceeding, Sims "need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." *Id*. at 461-62.  Sims, however, has raised no such claim because the government made no use either directly or derivatively of his compelled testimony.

Therefore, we find that Sims was properly compelled to give testimony as a witness at Childs' trial under a grant of statutory immunity, and furthermore, has in no way suffered harm from his compelled testimony.

## IV.

Finally, Defendant Sims argues that the district court erred when it failed to *sua sponte* order Childs, over Childs' attorney's objections, to submit to an interview by Sims' attorney before he testified.  We disagree.

At trial, after the government rested its case-in-chief, Sims' counsel advised the court that he intended to call convicted co-conspirator Childs to the stand as a defense witness.  Childs had not been subpoenaed by the defense.  Apparently, that morning, Sims' counsel learned from Sims that Childs rode with Sims on the bus to the court and Childs was present in the federal courthouse. Sims, against his counsel's advice, wanted Childs to testify on his behalf.  The court requested that Childs' counsel appear to advise the court on his position.  Childs' counsel appeared and advised the court that although he had met with Childs and recommended to him that he assert his Fifth Amendment privilege against self-incrimination, Childs told him he did not care and wished to testify.  Outside the presence of the jury, the court called Childs to the stand to clarify his position. Childs took the stand and stated that he wanted to testify on behalf of Sims and would waive his Fifth Amendment privilege against self-incrimination.

Sims' counsel then indicated that he would like to have the opportunity to interview Childs prior to his giving testimony.  The following exchange transpired:

> MR. REYNOLDS:  I've not had the opportunity to talk to Mr. Childs, obviously. He's represented by counsel, and I would like the opportunity to do so.  I discussed that with Mr. Mitchell, and I'd like the opportunity to talk with this witness, obviously, before calling him.  Mr. Mitchell has indicated to me that he at this point -- if I could call him up to have him give his position.
> MR. MITCHELL:  If I'm urging my client not to testify, Your Honor, it would be foolish of me to allow anybody else to speak to him with my permission.  So I would so decline.
> MR. REYNOLDS:  And I would need the opportunity, obviously, to talk with Mr. Childs before him being called.
> THE COURT:  You would normally have that, but he has a lawyer who's representing him in this matter and I have to turn to his lawyer and I have to ask his

lawyer what is his lawyer's best counsel for his client, and his lawyer's best counsel is he doesn't want you talking to him.
THE WITNESS:  I don't - - Your Honor, I don't have any objections to Mr. Reynolds talking to me.
THE COURT:  I understand.  I understand.  I understand.
* * *
MR. REYNOLDS:  . . . I understood the position that Mr. Mitchell took and I will not have the opportunity to interview Mr. Childs prior to his testimony.
THE COURT:  Right.

J.A. at 465-68.

Sims' counsel never directly sought an order from the court requiring Childs to submit to a pretrial interview.  We find that the district court did not err in declining to *sua sponte* order Childs, over his attorney's objections, to talk with Sims' attorney.  In any event, Sims has failed to show how he was prejudiced by the court's inaction, especially in light of the fact that Childs testified that Sims was not involved in the homicide at all.

## V.

In his single argument on appeal, Defendant Childs claims that the district court erred in denying his mistrial motion based on the government's alleged improper questioning of him at trial in violation of his Fifth Amendment right to remain silent.  Prior to trial, in an interview with FBI agents, Childs made an exculpatory statement explaining why his fingerprints were found at the scene of the murder.[2]   At trial, however, Childs gave a different explanation and admitted he fabricated his earlier statement in an attempt to be humorous.[3]  On cross-examination, the prosecutor asked Childs why he had not told the agents earlier about his new explanation for the presence of his fingerprints.  Child's counsel objected and moved for a mistrial, asserting that this questioning impermissibly commented on Child's Fifth Amendment right to remain silent.  The district court overruled the objection and denied Child's mistrial motion, finding that Childs was properly questioned about his failure to correct an earlier false statement to the police.

We review the denial of a mistrial motion for an abuse of discretion.  *United States v. Atisha*, 804 F.2d 920, 926-27 (6th Cir. 1986).

Childs bases his argument that the prosecutor impermissibly commented on his Fifth Amendment right to remain silent by asking him on cross-examination why he did not come forward earlier with his new explanation almost exclusively on *Doyle v. Ohio*, 426 U.S. 610 (1976).  Childs fails to consider, however, the later decision of *Anderson v. Charles*, 447 U.S. 404 (1980) (per curiam), which is controlling on the facts of his case.

In *Doyle*, two criminal defendants, who had made no post-arrest statements regarding their involvement in the crime, testified at trial that they had been framed.  Over their counsel's objections, the prosecutor asked the defendants why, if the exculpatory statements were true, they

---

[2]Childs explained the presence of his fingerprints at the murder scene by claiming that he stood on the shoulders of Willie Ross and peered into the bathroom window about a month before the murder in an attempt to see whether Chrissy was cheating on Willie.  The government had Willie Ross present at trial to rebut this claim.

[3]Childs recanted his earlier explanation and claimed that his fingerprints were found at the murder scene because his girlfriend, Jackie Love, at the request of Carolyn Ross, asked him to look into the house to see if Chrissy and Willie were cheating on Carolyn.  Childs also claimed that this took place only a day or two before the murder, which comported more closely with the fingerprint expert's testimony at trial that the fingerprints were not likely to have survived more than a day or two.  Childs explained that his earlier statement to the FBI agents was meant to be a joke.

had not offered them to the arresting officers after receiving *Miranda* warnings.  The Supreme Court held that such use of post-arrest silence to impeach was fundamentally unfair because *Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him.  426 U.S. at 618-19.

In *Charles*, however, the Supreme Court refused to find a *Doyle* violation where, after receiving *Miranda* warnings, a defendant elected to make post-arrest statements regarding the crime, and where a prosecutor used these inconsistent post-arrest statements to impeach the defendant's exculpatory testimony offered at trial.  The *Charles* Court found that, taken as a whole, the cross-examination did not refer to the defendant's exercise of his right to remain silent; rather, it questioned why, if his trial testimony were true, he did not tell the arresting officer that account of the events instead of telling him another inconsistent story.  447 U.S. at 408-09.  The Court reasoned that "[s]uch questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent.  As to the subject matter of his statements, the defendant has not remained silent at all."  *Id*. at 408.

As the defendant did in *Charles*, Childs elected to make post-arrest statements to the FBI agents, explaining the presence of his fingerprints at the scene of the murder.  Thus, *Doyle* does not bar the prosecutor from inquiring about Childs' failure to give the agents the new and different explanation he gave at trial, since it was inconsistent with his post-arrest statement, and raised the possibility of recent fabrication.  *See Hockenbury v. Sowders*, 718 F.2d 155, 159-60 (6th Cir. 1983).  This questioning does not draw a negative inference from the defendant's decision to remain silent, but rather from his prior inconsistent statement.  Therefore, we find that the prosecutor's questioning was proper and the district court did not abuse its discretion in denying Childs' motion for a mistrial.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** both defendants' convictions.