**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0370n.06

**No. 09-2374**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | ***Jun 02, 2011*** |
| | ) | LEONARD GREEN, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| BOBBIE JEAN SINKO, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |

Before: COOK, McKEAGUE, and GRIFFIN, Circuit Judges.

COOK, Circuit Judge. A jury convicted Bobbie Jean Sinko for committing several offenses against the United States during her tenure as an employee of the United States Postal Service (USPS). Because ample evidence supports her convictions, we affirm.

I.

Sinko was the bulk-mail clerk at the Mount Pleasant, Michigan Post Office, and her responsibilities included accepting bulk mail from customers, processing it, and collecting its postage due.

A postal investigation revealed that Sinko had been providing free delivery to two of her customers. Postal inspectors discovered that, during a five-year period, Sinko failed to collect over

$400,000 in postage from English Direct Mail Services, owned by Matthew English, as well over

$30,000 from English's client, Central Michigan University (CMU).

When questioned about the missing postage, Sinko explained it away as a careless error by a lackluster employee. She claimed that she was overworked and behind in her processing, and that English must have taken advantage of her oversights. She also speculated that some of the missing postage may have been due to computer error.

But the evidence told a different story: one of a quid-pro-quo relationship between Sinko and English. The inspectors found that English had employed three of Sinko's sons; that he had written $48,000 in checks to Sinko's son, Mike Andrews, long after he was an employee; and that, on some of the checks, the "pay to" name had been altered from "Postmaster" to "Mike Andrews."

A federal grand jury indicted Sinko on 32 counts of knowingly converting bulk-mail services to English's use, and 13 counts of knowingly converting them to CMU's; 1 count of conspiracy to defraud the USPS; and 4 counts of misappropriating federal postal funds. *See* 18 U.S.C. §§ 2, 371, 641, 1711. It also indicted English on various related counts. English pleaded guilty, and Sinko proceeded to trial.

At trial, Sinko unsuccessfully moved for acquittal based on insufficient evidence. Her defense then tracked her initial explanation to the inspectors: she made processing errors, English took advantage of them, and the checks had nothing to do with postage. Her defense also included

evidence that other employees sometimes handled the bulk mail, and that they sometimes sent it for delivery without first receiving payment.

The jury convicted Sinko of certain counts under each charge, and the district court sentenced her to a term of 33 months' imprisonment with restitution ordered in the amount of $354,498.

II.

Sinko now challenges the denial of her motion for acquittal. Because she failed to renew the motion at the close of all the proofs, we limit our review "to determining whether there was a manifest miscarriage of justice," which "occurs only if the record is devoid of evidence pointing to guilt." *United States v. Childs*, 539 F.3d 552, 558 (6th Cir. 2008) (internal quotation marks and citation omitted).

On the conversion counts, the record includes abundant evidence that Sinko "convert[ed] to . . . the use of another . . . any . . . thing of value of the United States or of any department or agency thereof." 18 U.S.C. § 641. Postal inspectors testified that, when investigating Sinko's workstation, they found many incomplete postage statements from English and his clients. They further testified that Sinko admitted to her billing errors and attributed them to being behind on her work, and that a full review of the office's records established that Sinko failed to collect nearly $500,000 worth of postage from her customers.

And the record is rife with evidence that Sinko accomplished this conversion "knowingly." The government showed the jury $48,000 worth of negotiated checks from English to Sinko's son Andrews, who shared a joint checking account with his mother. On many of these checks, the jury could clearly see "Postmaster" crossed out and replaced with "Mike Andrews." When called by the government, Andrews testified that he never requested or received the checks; he never obtained any of their proceeds; he never altered any of the ones written to the postmaster; and his mother cashed the checks herself.

English's own testimony stretches any remaining doubt beyond the breaking point. He stated that, every so often, Sinko would ask him for a check in her son's name, and that, if he refused, he believed that he would have to begin paying for his mailings. When asked about the checks that had been altered, English testified that he had originally written them as payment for bulk-mailing fees. On some of these checks, he made the alteration at Sinko's request; on others, the alteration was made without his knowledge.

This same evidence supports Sinko's conspiracy count. *See* 18 U.S.C. § 371 ("If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof . . . , and one or more of such persons do any act to effect the object of the conspiracy, . . . each shall be [punished]."). It demonstrates that Sinko and English engaged in, and acted in furtherance of, a conspiracy to violate § 641: Sinko fulfilled her quid by

sending English's mail without payment, he returned his quo by providing checks to Sinko and employment to her sons.

As to the counts charging that Sinko "convert[ed] to h[er] own use, or deposit[ed] in any bank, . . . any money or property coming into h[er] hands or under h[er] control . . . in the execution . . . of h[er] . . . employment," 18 U.S.C. § 1711, we again find ample record support: the altered checks; English's testimony that he originally wrote the checks as payment for bulk-mailing fees and changed some of them at Sinko's instruction; and Andrews's testimony that he never altered them. All confirm Sinko's work-related conversion—and, if that were not enough, a postal inspector testified that Sinko admitted to altering two of the checks herself.

To defend, Sinko offers two arguments. First, she contends that the CMU counts should be reversed because the university later paid its postage due. This recovery of converted funds, however, offers no absolution from the criminal conversion. Second, Sinko argues that the government failed to prove that she "had exclusive use" of her office's bulk-mail services. But this is not an element of any of her crimes. And to the extent that Sinko raises this argument to suggest that someone else bore responsibility for the billing failures, it is of no moment in her challenge to the denial of acquittal. Because we find that the record is not "devoid of evidence pointing to guilt," we look no further. *Childs*, 539 F.3d at 558.

III.

For these reasons, we affirm.