**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 14a0048n.06**

**No. 12-2639**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 21, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| ABDIQANI HASSAN, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |

**Before: COLE and GRIFFIN, Circuit Judges; PEARSON, District Judge.**[*]

**BENITA Y. PEARSON, District Judge.** Defendant-Appellant, Abdiqani Hassan, appeals his conviction after a jury trial for one count of immigration fraud in violation of 18 U. S. C. § 1546(a) (Count One), one count of identification document fraud in violation of 18 U.S.C. § 1028(a)(6) (Count Two), and one count of aggravated identity theft in violation of 18 U.S.C. § 1028A (Count Three). We are asked to determine whether: (1) the evidence is sufficient to satisfy the "corroboration rule" under the manifest miscarriage of justice standard; (2) the error regarding one of the prosecutor's questions of Hassan during cross-examination was harmless; and (3) the prosecutor's closing argument is plain error. For the reasons that follow, the conviction is affirmed.

---

[*]The Honorable Benita Y. Pearson, United States District Judge for the Northern District of Ohio, sitting by designation.

**I.**

Hassan was born in Somalia in 1986, moved to Kenya in 1990, and entered the United States in 2005 as a refugee.  He wanted to drive to Canada, but he needed a "Permanent Resident Card" or "green card."  Although Hassan had previously applied for one, the United States had denied his application.  Hassan and a friend, Abdihakim Jama, drove to Michigan, where they stayed for two days at a hotel outside of Detroit.  Then, early in the morning on May 3, 2012, Hassan and Jama drove to Canada over the Ambassador Bridge that connects Detroit with Windsor, Ontario.

At the U.S.-Canada border,  Canadian Border Services Agency officers intercepted Hassan and Jama and escorted them back from the border to U.S. Customs offices on the U.S. side of the Ambassador Bridge.  At the subsequent jury trial, Blake Bradley, an admissibility officer with U.S. Customs and Border Protection ("CBP"), testified that the Canadian officers gave him a green card in the name of  Mahad Farah.  Officer Bradley asked Hassan if the card belonged to him, and Hassan admitted that it did not and that he wanted to enter Canada with it.  Officer Bradley testified:

    A. I asked Mr. Hassan was that him on the card I was holding.
    Q. What response did you receive?
    A. Said it was not me.
    Q. Did he say anything else?
    A. Yes.  He had told me that the government had told him that he had to leave the United States, and he said that he wanted to try to enter and move into Canada with this card and if he could not move to Canada with it, then he would -- wanted to be deported back home.

R. 30 at Page ID #134.

2

CBP Officer Jeremy Ferguson, an enforcement officer, testified that he received a call from Officer Bradley and went to the Ambassador Bridge in Detroit. Officer Bradley gave him the green card in the name of Farah.

Officers Ferguson and Bradley interviewed Hassan. First, they read Hassan his *Miranda* rights using a written "Warning as to Rights" and "Waiver" form. Hassan signed the form, agreeing that he understood them. Then, still using the form, the officers asked Hassan whether he wished to waive his *Miranda* rights. Hassan said he did, and again, signed the form. Hassan then admitted that he stole the green card from Farah, another friend in Minnesota, and presented it as his own document to Canadian authorities at the checkpoint on the far side of the bridge in an attempt to enter Canada, but was refused entry. The officers typed each of Hassan's answers into a written "Record of Sworn Statement in Administrative Proceedings" form that they printed out, allowed Hassan to review the form for any mistakes, and asked him to initial next to each answer. Hassan agreed—initialing the confession 68 times and signing his full name at the end of it.

As the interview ended, Officer Ferguson continued to investigate the green card. He confirmed from an immigration database that the green card did, in fact, belong to Farah. He also tried to call Farah using a phone number listed in the database. When that number did not work, Hassan provided a different number. Officer Ferguson called it and was able to speak to a person who identified himself as Farah. During trial, the prosecutor asked if Officer Ferguson determined whether the green card had been stolen, but Defendant's hearsay objection was sustained.

3

> Q. Without telling me what Mr. Farah said, based on your conversation with him, did you determine that his green card had been stolen?
> [DEFENSE COUNSEL]: Your Honor --
> A. Yes, I did.
> [DEFENSE COUNSEL]: -- I object. The only way he can do that is to introduce hearsay.
> THE COURT: I'll sustain the objection.
> [DEFENSE COUNSEL]: I'd request a limiting instruction with respect -- well, there was no answer. I'm sorry.
> THE COURT: Objection sustained. That means it is not evidence before the jury to that question.
> Please proceed.

R. 30 at Page ID # 119-20.

Testifying in his own defense at trial, Hassan recanted his confession. This time, he claimed that both Farah and Jama had driven to Michigan with him and that he and Jama had decided to cross into Canada. He claimed that he did not know Farah's green card was in the car with them. Instead, he had decided to drive to the border—without any identification documents—so that he could speak with the Canadian authorities about residing in Canada.

Hassan also claimed that after he and Jama pulled up to the booth at the Canadian checkpoint, the Canadian officers searched their car—and that was when they found Farah's green card. Hassan claimed that he never told the Canadian officers that Farah's green card was his own. According to Hassan, as he and Jama crossed back over the bridge, Jama threatened to hurt Hassan's kids if Hassan did not admit to using Farah's green card.

On cross-examination, Hassan admitted that he had previously been convicted of using his brother's green card to enter Canada. Hassan also admitted that he had been

convicted of first-degree burglary in 2011. And Hassan admitted that he was involved with a Somali street gang in Minnesota—although he claimed that he was only participating to assist the FBI. Furthermore, unlike on direct examination, Hassan claimed that he had actually brought copies of his driver's license and immigration papers with him to the Ambassador Bridge. But, according to him, the Canadian officers never found those documents because they were only copies.

Near the end of Hassan's cross-examination, the prosecutor asked the following question about Officer Ferguson's phone call with Farah:

> Q. How can you explain the fact that when Officer Ferguson made contact with you and started doing some checking, he contacted Mr. Farah who was actually at work in Minnesota?

R. 30 at Page ID # 185. Defense counsel objected on the ground that the question assumed facts not in evidence. After the district court directed the prosecutor to rephrase the question, the prosecutor asked:

> Q. Can you explain how it is that Mr. Farah was working in Minnesota when he was contacted by Officer Ferguson?

R. 30 at Page ID # 187. The defense attorney again objected, and the trial court this time explained,

> Well, I overruled the objection. I think there was some testimony relating to a phone call and a phone number.

R. 30 at Page ID # 187. The cross-examination continued without objection:

> Q. Can you answer that question?
> A. Yes, I can answer that question. That was a lie because in the statement the phone number that I gave Mr. Ferguson, that I said that was my phone number, is the same number that Mr. Ferguson had contacted Mr. Mahad

> Farah and Mr. Mahad Farah who was, in fact, in a hotel here in Michigan called Victory Inn.
> Q. Why would Mr. Farah lie he didn't know anybody had his ID? He wasn't in any trouble.
> A. He knew everything.
> Q. He knew that you'd been given his ID to go to Canada?
> A. No, he did not know that, but he knew me and Mr. Jama was traveling to Canada.

R. 30 at Page ID # 187-88.

The prosecutor also made the following four statements during closing argument without objection. Hassan was returned to the United States by Canadian Border Services officers because he "was suspected to have presented an impostor identification or impostor permanent resident card that did not belong to [him]." R. 31 at Page ID # 204. Hassan had possessed and used the green card in Canada because "Canadian Border Services [would] have also talked to Defendant about that card." R. 31 at Page ID # 208. The prosecutor also said "we know" that Hassan possessed and used the card "because Customs and Border Protection actually escorted Defendant back to the United States, provided the [green card] that they were given to U.S. Customs and Border Protection. . . ." R. 31 at Page ID # 211.

In rebuttal, the prosecutor, again without objection, said that what the Canadian agents told Officer Bradley was evidence that Hassan used the card:

> Canadian Border Services does not turn every single person around and escort them back to the U.S. They do that when that's a problem, when there is a problem. And here the actions of Canadian Border Services and the information that was conveyed to Officer Bradley so that he could begin his investigation is circumstantial evidence that Defendant went to the border and that he presented the idendifi -- permanent resident card of Mahad Farah.

R. 31 at Page ID # 217.

After about three and a half hours of deliberations, the jury returned guilty verdicts on all three counts. Hassan was subsequently sentenced to 42 months' imprisonment—18 months on Counts One and Two, to run concurrently, plus 24 months on Count Three, to run consecutive to the term imposed in Counts One and Two. Hassan timely appealed his jury conviction and sentence.

**II.**

Hassan raises three issues, at least two of which he did not preserve for appeal.

**A.  Sufficiency of the Evidence**

Hassan argues that the evidence was insufficient to convict him on any of the three counts because the Government (1) failed to present any evidence that he possessed and used Farah's green card in Canada and (2) failed to call Farah as a witness to establish that his green card was stolen. Therefore, according to Hassan, there was a lack of substantial evidence to corroborate his pre-trial statement.

The record reflects that Hassan raised a Fed. R. Crim. P. 29 challenge to the sufficiency of the evidence at the conclusion of the Government's case. Hassan, however, failed to renew his motion for judgment of acquittal under Rule 29 at the close of all the evidence. Because Hassan neglected to renew his motion at the close of all the evidence, our review is limited "to determining whether there was a manifest miscarriage of justice," which "occurs only if the record is devoid of evidence pointing to guilt." *United States v.*

*Childs*, 539 F.3d 552, 558 (6th Cir. 2008) (internal quotation marks and citation omitted).
No such void exists here.

The corroboration rule provides that "no one may be convicted of a crime based solely on his uncorroborated confession." *United States v. Brown*, 617 F.3d 857, 860 (6th Cir. 2010). The prosecution need only introduce some independent evidence "bolster[ing] the confession itself." *Id.* at 863. That evidence need only bolster part of the confession, and once it does, the prosecution may "prove the offense 'through' the statements of the accused." *Id.* Officer Bradley testified about Hassan's return to the United States. He stated that Canadian Border Services Agency officers escorted Hassan to the Customs offices at the Ambassador Bridge on the U.S. side of the border. Officer Bradley received Farah's green card from the Canadian officers. He asked Hassan if the card was his green card, and Hassan said it was not and that he wanted to enter Canada with it. That is evidence pointing to guilt. Officer Bradley's observations—along with the green card itself—bolstered Hassan's confession and cleared the corroboration rule's low bar.

Resisting this conclusion, Hassan argues that since there was no evidence which corroborated his confession, the evidence was insufficient. Because we find that the record is not "devoid of evidence pointing to guilt," we look no further. *United States v. Frazier*, 595 F.3d 304, 306 (6th Cir. 2010); *Childs*, 539 F.3d at 558. We find that there is sufficient evidence that Hassan possessed and used Farah's green card without lawful authority. Accordingly, there is no manifest miscarriage of justice resulting from the corroboration

rule with respect to the sufficiency of the evidence supporting his conviction on each of the three counts.

### B. Cross-Examination

Turning to Hassan's second issue on appeal, he argues that the prosecutor asserted facts not in evidence during cross-examination. According to Hassan, this prosecutorial misconduct prejudiced him and denied him a fair trial under the Fifth Amendment and violated the Confrontation Clause of the Sixth Amendment.

After objecting to the first impeachment question at issue—when the prosecutor asked, "Can you explain how it is that Mr. Farah was working in Minnesota when he was contacted by Officer Ferguson?"—Hassan failed to object to the other impeachment questions that the prosecutor asked him near the end of cross-examination. He failed to object, when—after Hassan accused Farah of lying—the prosecutor asked Hassan why Farah would have lied. We, therefore, review the district court's ruling on the first question for an abuse of discretion and the remaining questions only for plain error. *United States v. Gibbs*, 506 F.3d 479, 483 (6th Cir. 2007).

Although the prosecutor's questions during cross-examination were probably erroneous, they do not warrant a retrial given the strength of the evidence against Hassan. The first of the questions that the prosecutor asked Hassan impeached Hassan with a portion of Farah's out-of-court statement—that "Farah was working in Minnesota"—even though that statement was inadmissible. *See United States v. Bao*, 189 F.3d 860, 866 (9th Cir. 1999) (an out-of-court statement offered to impeach is non-hearsay only when used

to show the declarant's own lack of consistency). Moreover, although the prosecutor's remaining questions might otherwise have been permissible, *see United States v. Dickens, 438 F. App'x 364, 370 n.2 (6th Cir. 2011)*, they only occurred here because of the previous improper question that encouraged them.

Any error in the prosecutor's questions during her cross-examination of Hassan was harmless in light of the significant other evidence at trial that established Hassan's guilt.

## C. Closing Argument

Finally, Hassan argues that the prosecutor also asserted facts not in evidence in closing argument. Therefore, according to Hassan, this additional prosecutorial misconduct prejudiced him and denied him a fair trial under the Fifth Amendment and violated the Confrontation Clause of the Sixth Amendment.

In challenging the prosecutor's closing argument, Hassan once again assumes that he objected at trial and preserved his challenge for appeal. He did not, and we review only for plain error. *United States v. White*, 563 F.3d 184, 193-94 (6th Cir. 2009). To obtain relief under plain error review, the appellant must demonstrate that "(1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; (3) the error 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *United States v. Marcus, 560 U.S. 258, 262 (2010)* (alteration in original) (quoting *Puckett v. United States, 556 U.S. 129, 135 (2009)*).

The four statements in the prosecutor's closing argument were supported by the evidence—most notably, Hassan's signed written post-*Miranda* confession, Officer Bradley's testimony, and evidence that the green card did not belong to Hassan. The prosecutor's statements were "reasonable inferences from the evidence." *United States v. Crosgrove*, 637 F.3d 646, 664 (6th Cir. 2011). Accordingly, Hassan's plain error challenge to the prosecutor's closing argument falls short of warranting reversal of all three of his convictions.

**III.**

For these reasons, we affirm the judgment of the district court.