NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0352n.06

No. 20-6194

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jul 20, 2021
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) |
| | ) |
| FNU JOHN SADIQULLAH, | ) |
| | ) |
| Defendant-Appellant. | ) |
| | ) |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY

BEFORE:    SUTTON, Chief Judge; COLE and READLER, Circuit Judges.

**CHAD A. READLER, Circuit Judge.**  Following a jury trial, Fnu "John" Sadiqullah was convicted of two conspiracy counts:  conspiracy to commit murder for hire, in violation of 18 U.S.C. § 1958, and conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(c).  On appeal, Sadiqullah primarily argues that those convictions were not supported by sufficient evidence.  He also alleges an instructional error and a sentencing disparity.  As none of Sadiqullah's challenges have merit, we affirm.

**BACKGROUND**

Sadiqullah immigrated to the United States from Afghanistan.  Taking up residence in Lexington, Kentucky, Sadiqullah began driving a taxi for a company operated by Lahoucine Elkohli.  Sadiqullah later recruited several other men, also natives of Afghanistan, to work as drivers for Elkohli.

Elkohli frequently borrowed money from his drivers, sometimes framing the loans as investment opportunities. And sometimes, Elkohli did not repay those loans. Having failed to secure full repayment from Elkohli on his own accord—as Elkohli recently relocated to Florida—Sadiqullah turned to Mahmoud Shalash, a local imam with a reputation for helping members of the Islamic community with their financial issues. Sadiqullah conveyed to Shalash that Elkohli owed him money and that he would "kill [Elkohli] if [he] [got] ahold of him."

As luck (in this case, bad luck) would have it, while Sadiqullah was in contact with Shalash, the FBI was investigating Shalash for money laundering. To further its investigation of Shalash, the FBI had elicited the participation of "Thomas Smith," an undisclosed FBI informant who engaged in a number of recorded transactions and meetings with Shalash. Initially, the scope of Shalash and Smith's relationship was limited to money laundering. Shalash, however, later inquired into Smith's propensity to engage in other criminal matters. Shalash explained to Smith that he had previously loaned a friend money to open a restaurant but had not been repaid. Shalash asked whether Smith could help him collect on the loan, indicating that he did not care if the collection efforts resulted in his friend's death. Smith expressed his willingness to help Shalash get repaid, even through means of violence, if necessary.

From these discussions, Shalash believed that Smith could also help Sadiqullah collect what he was owed from Elkohli. On April 30, Shalash met Smith at a motel in Lexington. The meeting was recorded. Shalash told Smith about the money Elkohli owed the taxi drivers, and that "[i]f [the drivers] get ahold of [Elkohli]," who had relocated to Florida, "they'll kill him." Shalash then called Sadiqullah and asked him to come to the motel, relaying that he had a "brother up here" who could help. Upon his arrival, Sadiqullah reiterated to Smith that Elkohli owed him (and others) money, but had fled with his family to Florida. Due to some tension with the other drivers,

Sadiqullah explained, he had not been provided with Elkohli's new address. Smith suggested that Shalash sit down with the other drivers and that Sadiqullah smooth things over in an effort to obtain Elkohli's address. Once Smith could locate Elkohli, he could begin his collection efforts by kidnapping and killing Elkohli. Smith explained that he would "take [Elkohli] and do what we want to do with him until he pays the tab."

Smith and Sadiqullah continued their conversation, outside of Shalash's presence:

> Smith: Do you care what happens to this guy to get your money back?
>
> Sadiqullah: No, we don't care. We want him [to] die.
>
> Smith: You want him dead?
>
> Sadiqullah: Yeah, we want him [to] die, you know, like because he made us die.

Sadiqullah further explained that Elkohli's actions hurt the drivers both financially and emotionally. Sadiqullah elaborated on the hardships he and the others faced, relaying that if, for example, "someone can kill [Elkohli] for $10,000, we all four will pay someone $10,000."

When Shalash returned to the conversation, Smith conveyed that once he received Elkohli's address, he would travel to Florida to kidnap Elkohli's wife and daughter in an effort to force Elkohli to pay. Sadiqullah informed Smith that Elkohli also had a son who lived in Lexington, and implied that Elkohli's son would be the most effective target for the kidnapping because Elkohli "love[s] his son." Smith responded that he would kidnap the son, beat him, and then send pictures to Elkohli accompanied by the message that "if we don't have our money within two days, you're going to find body parts of this kid all over the place." Sadiqullah voiced some hesitation over the possibility of Elkohli potentially filing kidnapping charges. But Smith and Shalash reassured Sadiqullah that no such charges would be filed.

3

As the conversation was wrapping up, the topic returned to Smith's compensation. Smith clarified that his services were "not free" and explained that if he recovered the money, Smith would be entitled to 25% of those funds. Shalash compared the arrangement to that of a lawyer's contingency fee, in that Smith would be paid once he achieved his objectives. Sadiqullah confirmed that he had Smith's phone number and stated he would be in touch once he met with the other drivers.

Sadiqullah's involvement in the scheme soon escalated. Two days after his meeting with Smith, Sadiqullah spotted Elkohli in Lexington. Sadiqullah followed him to a tire store Elkohli operated and alerted the other drivers to meet him there. He also called Smith. Smith testified that Sadiqullah explained that he had located Elkohli and his son at a tire store and that he and the other drivers would hold Elkohli until Smith could arrive to "do whatever . . . to get his money." Smith told Sadiqullah not to harm Elkohli. Smith then notified the FBI.

At the tire store, the drivers demanded immediate repayment from Elkohli and threatened to harm both him and his son. Elkohli assured the drivers that he had arranged a meeting with his bankruptcy attorney to discuss repaying the drivers. Elkohli and his son then left the store. Smith, as directed by the FBI, contacted Sadiqullah. Sadiqullah informed Smith that Elkohli was no longer with the drivers and that he did not know Elkohli's current whereabouts. Sadiqullah also conveyed that he was content with the scheduled meeting with Elkohli's attorney and directed Smith not to act until Sadiqullah had the opportunity to speak with the other drivers.

The FBI placed Elkohli and his son in protective custody, and arrested Shalash, Sadiqullah, and one of the other drivers. Shalash pleaded guilty to conspiracy to commit kidnapping and money laundering and was sentenced to 24 months in prison. Sadiqullah took his case to trial.

A jury convicted Sadiqullah of conspiracy to commit murder for hire and conspiracy to commit kidnapping. The district court sentenced Sadiqullah to 106 months in prison, below his applicable Guidelines range. The court later denied Sadiqullah's motion for judgment of acquittal or, alternatively, a new trial. This timely appeal followed.

## ANALYSIS

*Sufficiency of the Evidence.* Sadiqullah argues that the government failed to present evidence sufficient to support a conviction for conspiracy to commit murder for hire, *see* 18 U.S.C. § 1958, or conspiracy to commit kidnapping, *see* 18 U.S.C. § 1201(c). In light of the jury's verdict, however, Sadiqullah faces a "very heavy burden" on appeal. *United States v. Ledbetter*, 929 F.3d 338, 351 (6th Cir. 2019) (citation omitted). After "viewing the evidence in the light most favorable to the prosecution," Sadiqullah's sufficiency challenge fails if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Childs*, 539 F.3d 552, 558 (6th Cir. 2008) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

1. To prove a conspiracy to violate the murder-for-hire statute, the government had to show that: (1) Sadiqullah conspired to use an interstate facility "with intent that a murder be committed" in consideration for "anything of pecuniary value" to be paid to the killer; (2) Sadiqullah knowingly and voluntarily joined the conspiracy; and (3) a member of the conspiracy performed an overt act. *See* 18 U.S.C. § 1958(a); *United States v. Cordero*, 973 F.3d 603, 616 (6th Cir. 2020). Sadiqullah first questions the government's evidence that he entered into an agreement to commit a murder for hire. An agreement is the hallmark of any conspiracy. To prove that an agreement existed, the government had to show that two or more parties shared a mutual intent to carry out the conspiracy's main objective, here, that Smith would be paid in

exchange for killing Elkohli. *See United States v. Amawi*, 695 F.3d 457, 476 (6th Cir. 2012) (noting that "the government need not prove that each defendant knew every detail of" the conspiracy, only that "each defendant adopted the conspiracy's main objective"). And the agreement need not be "formal"; rather, "a tacit or mutual understanding among the parties" will suffice. *Ledbetter*, 929 F.3d at 351 (quoting *United States v. Gardiner*, 463 F.3d 445, 457 (6th Cir. 2006)).

The government presented sufficient evidence that Sadiqullah and Shalash agreed to hire Smith to murder Elkohli. Chief among that evidence were the audio recordings of the April 30 meeting between Sadiqullah, Shalash, and Smith. During that meeting, Sadiqullah expressed his interest in having Smith kill Elkohli, with Smith to be paid for his services. Sadiqullah repeatedly stated, "[w]e want [Elkohli] [to] die." At trial, Shalash explained that he introduced Sadiqullah to Smith because Sadiqullah expressed a desire to kill Elkohli for failing to repay Sadiqullah, and because Shalash believed Smith had the means to force repayment. By facilitating the meeting, Shalash testified that he was forming an agreement with Sadiqullah to hire (and pay) Smith to kidnap and do "whatever it takes" to retrieve Sadiqullah's money from Elkohli.

Sadiqullah resists this conclusion on three grounds. One, he says there was no mutual understanding or shared intent as to whether Smith would commit murder or merely a kidnapping. True, Shalash testified that he and Sadiqullah formed an agreement for Smith to "kidnap [Elkohli's] son," whereas Smith testified that the agreement was to "kill[] [Elkohli]." But there was sufficient evidence at trial from which a reasonable jury could conclude that Sadiqullah and Shalash intended—and agreed—to have Smith commit both crimes: kidnapping and killing Elkohli. To the extent the testimony conflicts in some respects, we must resolve the conflict in the government's favor. *See Cordero*, 973 F.3d at 614.

Two, Sadiqullah argues that, at most, any agreement existed only between himself and Smith, demonstrating a fundamental flaw in the government's evidence in that a conspiracy cannot exist based solely on an agreement between a defendant and a government informant. *See id.* at 617; *United States v. Deitz*, 577 F.3d 672, 681 (6th Cir. 2009). Even so, evidence of Sadiqullah's conversations with Smith could be used to establish the existence of a conspiracy between Sadiqullah and others. *Cordero*, 973 F.3d at 617. And here, recordings of the April 30 meeting could support the conclusion that Sadiqullah and Shalash intended to hire Smith for the purpose of obtaining Sadiqullah's money from Elkohli and ultimately killing Elkohli. That the government voluntarily dismissed Shalash's charge for conspiracy to commit murder for hire as part of a plea agreement to avoid trial does not foreclose the jury from finding Sadiqullah guilty of that charge at trial. *Cf. United States v. Crayton*, 357 F.3d 560, 565 (6th Cir. 2004) (noting that even the "acquittal of all but one co-conspirator . . . does not necessarily indicate that the jury found no agreement to act").

Finally, Sadiqullah asserts that he did not intend or agree to pay anything of pecuniary value to Smith in exchange for killing Elkohli, a required element of a murder-for-hire offense. *See* 18 U.S.C. § 1958. But the record includes sufficient evidence for the jury to have concluded otherwise. For instance, Sadiqullah stated in a recorded conversation that he (and the other drivers) would be willing to pay $10,000 to have Elkohli killed: "If someone can kill him for $10,000, we all four will pay someone $10,000." Likewise, Sadiqullah, Shalash, and Smith discussed a 25% fee Smith would be entitled to should he recover Sadiqullah's money from Elkohli. During that conversation, Smith explained that "if we collect, 200,000 of your money, we're taking 25%. It's just the way it is." Shalash clarified that Smith would be paid only after Smith succeeded in carrying out the agreed-upon plan (which, as already noted, would likely result in Elkohli's

murder). Especially as Smith had no personal stake in Elkohli's death other than in a murder-for-hire context, it was not unreasonable for the jury to infer that Sadiqullah and Shalash intended to pay Smith for carrying out the plan. To be sure, the agreement could have been more explicit. But even vague statements in that regard can be sufficient to uphold a murder-for-hire conspiracy. *See Cordero*, 973 F.3d at 614–15 (holding statements that the killer would "receive 'probably more' than $20,000" and that he would not "'do it for peanuts'" were sufficient to satisfy the pecuniary-value element); *United States v. Moonda*, 347 F. App'x 192, 199 (6th Cir. 2009) (holding the alleged hit man's trial testimony regarding a defendant's intent to pay him was sufficient to satisfy the pecuniary-value element). All told, these statements, when considered together, and when viewed in the light most favorable to the government, provide evidence from which a jury could fairly conclude that Sadiqullah and Shalash promised to pay Smith something of pecuniary value should Smith succeed in murdering Elkohli. *See Cordero*, 973 F.3d at 614–15.

2. The evidence was likewise sufficient for the jury to convict Sadiqullah of conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c). To convict Sadiqullah of that offense, the government was required to show that: (1) Sadiqullah had an agreement to kidnap, abduct, seize, or confine another person for ransom, reward, or other benefit, involving travel in or the use of an instrumentality of interstate commerce; (2) Sadiqullah knowingly and voluntarily joined the conspiracy; and (3) a member of the conspiracy performed an overt act. 18 U.S.C. § 1201(c); *United States v. Small*, 988 F.3d 241, 252 (6th Cir. 2021). At trial, the government presented evidence that Sadiqullah and Shalash formed an agreement during the April 30 meeting to have Smith kidnap Elkohli or his son. An audio recording of the meeting revealed that, at multiple points, Sadiqullah not only agreed with the plan to have Smith commit a kidnapping, but also contributed to the plan by offering Elkohli's son as a potential target.

Sadiqullah challenges the sufficiency of the government's evidence in two respects. First, he contends that any purported agreement was conditioned on the participation of the other drivers. True, at one point, Sadiqullah did relay to Smith that he must speak with the other drivers prior to Smith taking action. Sadiqullah now argues that he understood this instruction to mean that he would contact Smith only if the other drivers agreed to the plan. That interpretation, while perhaps plausible, is undermined by the fact that at no point did Sadiqullah or Shalash expressly condition the existence of their conspiracy on the participation of the others. And Sadiqullah's interpretation likewise is at odds with Shalash's trial testimony. Shalash testified that he and Sadiqullah were set to speak with the drivers to discuss (1) obtaining Elkohli's address and (2) providing each driver with the opportunity to join the (already formed) conspiracy. Shalash further clarified that should a driver not agree to join, nothing of consequence would occur to the conspiracy as Shalash and Sadiqullah's agreement would remain intact. Thus, when read in the light most favorable to the government, these statements allowed a jury fairly to conclude that Sadiqullah and Shalash agreed to recruit the other drivers into the existing conspiracy, rather than condition the agreement on their joining.

Second, Sadiqullah argues that his words and actions upon confronting Elkohli at the tire store undermine the existence of an agreement to commit kidnapping. After he and the drivers confronted Elkohli and Elkohli in turn agreed to arrange a meeting with his bankruptcy attorney, Sadiqullah says he demonstrated his disinterest in Smith's assistance. True, in subsequent calls, Sadiqullah both refused to provide Smith with either Elkohli's or his son's address and told Smith to not take any action until Sadiqullah had discussed the plan with the drivers. Those expressions, however, were seemingly too little and too late, considering that they occurred only after Sadiqullah (1) formed a conspiratorial agreement on April 30, and (2) acted on that agreement by

calling Smith to explain that he had "captured" Elkohli and to ask Smith to "come and get him." In other words, because there is sufficient evidence in the record to show that Sadiqullah formed a conspiracy, Sadiqullah's later actions cannot function to undermine or negate that already existing conspiracy. At best, this evidence could cast some doubt on Sadiqullah's intent to form a conspiratorial agreement, but "[a]ll conflicts in the testimony are resolved in favor of the government, and every reasonable inference is drawn in its favor." *United States v. Vasquez*, 560 F.3d 461, 469 (6th Cir. 2009). To the extent those statements could be characterized as an effort to abandon or withdraw from the conspiracy, Sadiqullah did not raise that affirmative defense in the district court. *See Smith v. United States*, 568 U.S. 106, 110–11 (2013) (noting the burden of proving withdrawal from a conspiracy falls on the defendant). Nor, at all events, has he demonstrated that he took an affirmative action to "disavow or defeat the purpose" of the conspiracy, *id.* at 113 (quotations omitted), as opposed to "[m]ere cessation of activity," which is not sufficient to establish withdrawal, *United States v. Bucio*, --- F. App'x ---, 2021 WL 2030077, at *4 (6th Cir. May 21, 2021) (quoting *United States v. Lash*, 937 F.2d 1077, 1083 (6th Cir. 1991)). Sadiqullah and Shalash formed an agreement by which Smith would kidnap Elkohli (or his son); any subsequent statements at most reflect Sadiqullah ceasing his earlier activity, not a formal withdrawal from the conspiracy. *See Smith*, 568 U.S. at 112–13.

*Entrapment Instruction*. Sadiqullah next claims that the district court erred in denying his request that the jury be instructed on the affirmative defense of entrapment. We review the district court's determination for an abuse of discretion. *United States v. Anderson*, 605 F.3d 404, 411 (6th Cir. 2010). A district court abuses its discretion in this setting when it fails to give an instruction that is "(1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to

give it substantially impairs the defendant's defense." *United States v. Theunick*, 651 F.3d 578, 589 (6th Cir. 2011) (quoting *United States v. Franklin*, 415 F.3d 537, 553 (6th Cir. 2005)).

To be entitled to an entrapment instruction, Sadiqullah had to present evidence of "(1) government inducement of the crime, and (2) a lack of predisposition on the part of the defendant to engage in the criminal conduct." *United States v. Demmler*, 655 F.3d 451, 456 (6th Cir. 2011) (brackets omitted) (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1988)). As to the first prong, government inducement requires "something more than merely affording an opportunity or facilities for the commission of the crime," *United States v. Poulsen*, 655 F.3d 492, 502 (6th Cir. 2011) (quotations omitted), such as the government exerting excessive pressure upon the defendant or taking advantage of the defendant's alternative, non-criminal motive, *see United States v. Sutton*, 769 F. App'x 289, 297 (6th Cir. 2019). We disagree with Sadiqullah that Smith's suggestion that he kidnap Elkohli is evidence of government inducement. *See United States v. Summers*, 238 F. App'x 74, 76 (6th Cir. 2007) ("Government agents do not entrap by merely presenting the opportunity to engage in criminal activity."). Even if Smith first suggested a kidnapping, to show entrapment, Sadiqullah must also show some manner of pressure or persuasion by the government. *See Sutton*, 769 F. App'x at 298. None exists here. Far from the government exerting excessive pressure or persistent persuasion, it was Sadiqullah, in fact, who followed up on Smith's suggestion with one of his own: that Smith kidnap Elkohli's son.

All told, because Sadiqullah failed to present sufficient evidence of entrapment, the district court did not abuse its discretion in denying his request for a jury instruction. *See Poulsen*, 655 F.3d at 503 (holding that when there is "no government inducement, we not examine the issue of predisposition").

*Sentencing Disparity.*  Finally, Sadiqullah argues that he was improperly sentenced to a disproportionate term of imprisonment.  We review the district court's sentencing decision for an abuse of discretion.  *United States v. Presley*, 547 F.3d 625, 629 (6th Cir. 2008).  And we presume that sentences within the Guidelines range are reasonable.  *See United States v. Pirosko*, 787 F.3d 358, 374 (6th Cir. 2015).  Moreover, "a defendant attacking the substantive reasonableness of a *below*-guidelines sentence has an even heavier burden to overcome."  *United States v. Elmore*, 743 F.3d 1068, 1076 (6th Cir. 2014).

As grounds for establishing a sentencing disparity, Sadiqullah contrasts his 106-month sentence with the 24-month sentence imposed upon Shalash.  According to Sadiqullah, that variation runs afoul of 18 U.S.C. § 3553(a)(6)'s command that a sentencing judge "avoid unwarranted sentence disparities."  Section 3553(a)(6), however, "is not concerned with disparities between one individual's sentence and another individual's sentence, despite the fact that the two are co-defendants."  *United States v. Simmons*, 501 F.3d 620, 623 (6th Cir. 2007).  Rather, by its terms, § 3553(a)(6)'s focus is on "defendants with similar records who have been found guilty of similar conduct," *id.*, which, in practice, we have understood to counsel against "*national* disparities between defendants with similar criminal histories convicted of similar criminal conduct." *United States v. Wright*, 991 F.3d 717, 720 (6th Cir. 2021) (citation omitted).  Sadiqullah has identified no such national disparity.  Nor is Shalash similarly situated; unlike Sadiqullah, he accepted a plea agreement as well as responsibility for his crimes, avoiding a trial.

The district court, it bears adding, imposed a below-Guidelines sentence, stating that it was "mindful of sentencing disparities" and that it recognized that "similarly situated defendants should be punished similarly."  So while Sadiqullah disagrees with the district court's balancing of the sentencing factors, it is both the case that the court had disparities in mind at sentencing,

and that the court sentenced Sadiqullah at a level below that set by the Guidelines.  No abuse of discretion occurred.

*    *    *    *    *

Sadiqullah also argues that the cumulative effect of the district court's errors renders his trial fundamentally fair.  But as no error occurred below, we reject that argument, and affirm the district court's judgment.  *See Ledbetter*, 929 F.3d at 365.