RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0142p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ROBERT B. LEDBETTER (17-3299 & 17-3309); CHRISTOPHER A. HARRIS (17-3304 & 17-3306); RASHAD A. LISTON (17-3302 & 17-3308); DEOUNTE USSURY (17-3289 & 17-3297); CLIFFORD L. ROBINSON (17-3290),

*Defendants-Appellants*.

Nos. 17-3289/3290/3297/3299/3302/
3304/3306/3308/3309

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:14-cr-00127—Algenon L. Marbley, District Judge.

Argued:  March 13, 2019

Decided and Filed:  July 3, 2019

Before:  MERRITT, CLAY, and ROGERS, Circuit Judges

_____

## COUNSEL

**ARGUED:**  Timothy J. McKenna, TIMOTHY J. MCKENNA, LLC, Cincinnati, Ohio, for Appellant Ledbetter.  Margaret Sind Raben, GUREWITZ & RABEN, PLC, Detroit, Michigan, for Appellant Harris.  Gregory A. Napolitano, LAUFMAN & NAPOLITANO, LLC, Cincinnati, Ohio, for Appellant Liston.  Claire R. Cahoon, FEDERAL PUBLIC DEFENDER, Toledo, Ohio, for Appellant Ussury.  Steven S. Nolder, SCOTT & NOLDER CO. LPA, Columbus, Ohio, for Appellant Robinson.  Mary Beth Young, UNITED STATES ATTORNEY'S OFFICE, Columbus, Ohio, for Appellee.  **ON BRIEF:**  Timothy J. McKenna, TIMOTHY J. MCKENNA, LLC, Cincinnati, Ohio, for Appellant Ledbetter.  Margaret Sind Raben, GUREWITZ & RABEN, PLC, Detroit, Michigan, for Appellant Harris.  Gregory A. Napolitano, LAUFMAN & NAPOLITANO, LLC, Cincinnati, Ohio, for Appellant Liston.  Claire R. Cahoon, FEDERAL

PUBLIC DEFENDER, Toledo, Ohio, for Appellant Ussury.   Steven S. Nolder, SCOTT & NOLDER CO. LPA, Columbus, Ohio, for Appellant Robinson.  Mary Beth Young, Kimberly Robinson, UNITED STATES ATTORNEY'S OFFICE, Columbus, Ohio, for Appellee.

_____

**OPINION**

_____

ROGERS, Circuit Judge.  The Short North Posse gang—and its two subsidiaries, the Homicide Squad and Cut Throat Committee—wreaked havoc for the better part of a decade in the Short North neighborhood of Columbus, Ohio.  To support its drug enterprise, the Short North Posse conducted brutal home-invasion style robberies and planned and executed the murder of rivals, high-value targets, and cooperating witnesses.  After a two-month-long jury trial, four of the five appellants—Robert Ledbetter, Deounte Ussury, Rashad Liston, and Christopher Harris—were convicted of RICO conspiracy for their membership in the Short North Posse enterprise.  All five, including Clifford Robinson, were convicted of various murders in aid of racketeering and other similar crimes.  On appeal, defendants collectively raise more than fifteen claims, only two of which have merit.  Ussury's conviction for the murder of Dante Hill in aid of racketeering must be vacated because there is insufficient evidence that Ussury acted with the necessary statutory purpose, and Harris's and Robinson's convictions for murder by firearm during a crime of violence must be vacated in light of *United States v. Davis*, No. 18-431, __ S. Ct. __, 2019 WL 2570623 at *13 (June 24, 2019).

**I.**

In 2014, a federal grand jury returned an indictment against seventeen defendants, including the five here.  The overriding count alleged a RICO conspiracy from 2004 to 2014, in which the Short North Posse enterprise and its associates committed overt racketeering acts ranging from murder and robbery to drug distribution and witness tampering.  The indictment alleged more than ten counts of murder in aid of racketeering.  More indictments followed and eventually thirteen defendants pleaded guilty, one was convicted after a solo trial, and the five defendants here were tried together before a jury.

At trial the Government put on more than one hundred witnesses, several of whom were former Short North Posse members. The evidence showed that the Short North Posse, which identified itself as a local affiliate of the national Crips gang, was engaged in buying, selling, and distributing cocaine and marijuana. The gang protected its business and supplemented its income through robberies, often armed and regularly of the brutal home-invasion variety. The Short North Posse maintained its clout through violence and intimidation against those who meddled in its business or harmed or disrespected its members.

Apparently, Ledbetter was the de facto leader of the gang, and under his management the gang formed two sub-groups, known as the "Cut Throat Committee" and "Homicide Squad," specializing in murders and robberies of rival gang members, competing drug dealers, and other deep-pocket targets. Ledbetter often orchestrated these jobs, and any gang members and outside associates who participated would typically be paid or split the spoils. Former Short North Posse members identified Ledbetter, Liston, Harris, and Ussury as members or associates of the Homicide Squad.

At trial, the jury heard evidence about eight charged murders, discussed in more detail below in connection with our analysis of the claims on appeal. Those murders include the revenge killing of Alan Johnson for the death of Ledbetter's brother, the murder of Donathan Moon during a night-time raid of a target's house and business, and the assassination of Crystal Fyffe for her cooperation with police. In addition to those murders, the jury heard about many other criminal acts in furtherance of the enterprise conspiracy—like a 2006 gun-battle between the Short North Posse and its rival gang, D-Block, which saw more than three hundred rounds fired and several people shot. After two months of trial, each of the five defendants was convicted and sentenced to at least one mandatory life sentence for murder in aid of racketeering under 18 U.S.C. § 1959, and all but Robinson were convicted of RICO conspiracy, 18 U.S.C. § 1962(d), among several other convictions and sentences.

**II.**

Defendants have raised a number of issues on appeal.  All but two lack merit.

**A.  Severance Motions**

Ussury and Robinson did not want to be tried with each other or their other codefendants, out of fear that they would be prejudiced by their codefendants' long and ignominious resume of bad acts.  They each moved for severance, but the district court held that a joint trial was preferable.  Ussury argues that joinder under Federal Rule of Criminal Procedure 8(b) was improper from the start, and both Ussury and Robinson argue that the district court abused its discretion in denying their motions for severance under Rule 14 because of spillover prejudice.  Neither argument holds water.  Joinder was permissible under Rule 8(b), and the district court did not abuse its discretion in denying severance absent a specific, compelling showing of prejudice.

Joinder was proper under Rule 8(b) because four of the five defendants (including Ussury) were indicted for the same RICO conspiracy, and all were charged with various murders in furtherance of the same racketeering enterprise.  For joinder, the allegations in the indictment are what matter.  *See United States v. Chavis*, 296 F.3d 450, 456 (6th Cir. 2002).  Under Rule 8(b), the government can charge multiple defendants in the same indictment if "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  Here, the defendants were charged with participating in or assisting the same racketeering enterprise—the Short North Posse—and many were charged in the same racketeering murders too.  Every count in the indictment allegedly arose out of defendants' conduct on behalf of or in coordination with the Short North Posse.  That is enough for Rule 8(b), as we have long held in RICO conspiracy cases.  *See United States v. Davis*, 707 F.2d 880, 883 (6th Cir. 1983).  Forcing the Government to prove these overlapping facts again and again in multiple trials would only cause the sort of unnecessary expense, inconvenience, and delay that joinder is meant to avoid.  *Cf. United States v. Lane*, 474 U.S. 438, 449 (1986).

Setting the initial joinder aside, Ussury and Robinson together argue that the court abused its discretion by not severing the trials under Rule 14(a) for prejudice. Under Rule 14(a), a district court "may" sever a joint trial if trying the moving defendant together with others "appears to prejudice [the] defendant." Fed. R. Crim. P. 14(a). To overturn a denial of severance, a defendant must show "compelling, specific, and actual prejudice" resulting from the joint trial. *See United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005). But neither defendant has done this. Instead they raise generalized concerns that are inherent in joint trials and that have been held to fall short of compelling prejudice: that "proof is greater against a co-defendant," *United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir. 1992), that each "may have [had] a better chance of acquittal in separate trials," *Zafiro v. United States*, 506 U.S. 534, 540 (1993), and that "inflammatory evidence [was] admitted against one defendant, not directly involving another codefendant," *United States v. Gallo*, 763 F.2d 1504, 1525 (6th Cir. 1985). Mere statement of these common concerns is not a specific, compelling showing of actual prejudice.

Robinson's argument on this front is somewhat stronger because he was not charged with RICO conspiracy or alleged to have been a Short North Posse member. Evidence showed that he was more of an outside associate, helping out on certain jobs in exchange for a share of the profits. Even so, Robinson's charge for murder in aid of racketeering required the Government to prove that the Short North Posse was a racketeering enterprise and that Robinson acted to earn a profit from the enterprise. *See* 18 U.S.C. § 1959(a). That makes the crimes of Robinson's codefendants in furtherance of that enterprise relevant vis-à-vis Robinson—they speak to the existence and purpose of the enterprise that Robinson was charged with aiding. Thus, much of the evidence putatively against Robinson's codefendants would be admissible against him in a separate trial. "Where the same evidence is admissible against all defendants, a severance should not be granted." *See Warner*, 971 F.2d at 1196.

Were there any doubt, the district court gave a limiting instruction—that the jury separately consider evidence against each defendant on each charge. That instruction sufficed to cure any risk of prejudice. *See Zafiro*, 506 U.S. at 539.

**B. Ledbetter's Suppression Motion**

Ledbetter challenges the district court's refusal to suppress drugs, cash, and a handgun that police discovered on him and in his car during a traffic stop.

In December 2007, long before trial, Ledbetter ran a red light and turned without signaling and so was pulled over by police. Police had been following Ledbetter since he made a pitstop at a suspected drug house a few miles back. But Ledbetter concedes that the stop was based on the traffic violations and thus lawful. Ledbetter disputes, however, that the officers reasonably suspected him of being armed and dangerous when they ordered him out of the car and frisked him for weapons. The frisk uncovered marijuana and large wads of cash, which gave officers probable cause to search the rest of the car; that search turned up more marijuana, crack cocaine, a 9mm handgun, and $45,000 in cash. Ledbetter moved to suppress this evidence on the ground that the *Terry* frisk was unlawful and thus tainted the subsequent dog-sniff and search of the car. In other words, without the drugs discovered during the pat down (which Ledbetter says is unsupported by reasonable suspicion), officers would not have had probable cause to search the car. But the district court correctly held that officers had sufficient reasonable suspicion to perform the pat down.

Given the totality of the circumstances, the officers reasonably concluded that Ledbetter might be armed and presently dangerous. The *Terry* frisk was therefore proper. *See Arizona v. Johnson*, 555 U.S. 323, 331 (2009) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977) (per curiam)). First, the officers testified (and the district court found) that Ledbetter did not immediately stop after the officers activated their lights and siren. Instead, Ledbetter completed a turn, "slowed down in an apparent feint to pull over, sped up, and then finally pulled over for good" at the next intersection. The initiating officer testified that this behavior was "a huge red flag" because "[w]hen we've seen that before in the past, that's somebody who is trying to hide a gun, or do something to harm us." Second, as the officers approached the car, Ledbetter was facing the passenger seat with his hands toward the center console (rather than looking back at the officers or straight ahead with his hands on the wheel)—an action that the officer testified was consistent with reaching for or hiding a weapon. Third, the officers noticed that Ledbetter

was sweating profusely, breathing heavily, and had glassy eyes and "uncontrollably" shaky hands.

These facts, taken together, support a reasonable suspicion that Ledbetter might have been armed and dangerous. This court has held repeatedly that a driver's behavior—most notably, the failure to immediately pull over and any attempts to evade officers—can support a reasonable suspicion. *See, e.g.*, *Hoover v. Walsh*, 682 F.3d 481, 495 (6th Cir. 2010); *United States v. McCauley*, 548 F.3d 440, 445 (6th Cir. 2008); *Watkins v. City of Southfield*, 221 F.3d 883, 889 (6th Cir. 2000). This court has also found reasonable suspicion where a defendant reaches his hand between the center console and the passenger seat as officers approach. *See United States v. Bost*, 606 F. App'x 821, 825 (6th Cir. 2015). Ledbetter's overly nervous behavior, although less probative and thus less relevant, *see United States v. Noble*, 762 F.3d 509, 522 (6th Cir. 2012), may also contribute to a reasonable suspicion, *see Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Finally, it is relevant that the stop occurred at night in a high-crime area. *See Hoover*, 682 F.3d at 495 (citing *Wardlow*, 528 U.S. at 124). Though individually these facts might not support a reasonable suspicion, together they do.

In any event, any error in admitting the evidence was harmless. The evidence obtained through the search was not essential to any of Ledbetter's convictions and played only a minimal role in the two-month trial. Ledbetter makes much of the fact that his possession of this contraband was listed in the indictment as an overt act in furtherance of the RICO conspiracy. But it was one of more than one hundred other acts, and was in no way central to his conviction. The jury needed to find only two overt acts to convict Ledbetter of conspiracy—and, in fact, found that Ledbetter committed three murders in connection with the enterprise. In light of the extensive evidence at trial, any error in the admission of this evidence was harmless. *See United States v. Garcia*, 496 F.3d 495, 506 (6th Cir. 2007).

## C. Expert Testimony

Liston, Harris, and Ussury argue that the district court improperly allowed opinion testimony by L.A. Police Detective Wayne Caffey, on gang (and specifically Crips) culture and customs, and by Columbus Police Lieutenant Smith Weir, on Columbus gangs specifically

(including the Short North Posse). They did not object on these grounds below, so their claims are subject to "plain error" review. There was no plain error here. The court properly followed the procedure set out in *United States v. Johnson*, 488 F.3d 690 (6th Cir. 2007), for qualifying Detective Caffey as an expert, Detective Caffey's expert testimony on gang customs was relevant, and the Government's failure to properly notice Detective Caffey as an expected witness was harmless. As to Lieutenant Weir, the court did not abuse its discretion in permitting his lay-witness opinion testimony about the Short North Posse.

As an initial matter, these challenges are subject to "plain error" review because the defendants did not object below. *See Johnson*, 488 F.3d at 697. Defendants are conspicuously silent on this point as to Lieutenant Weir but contend that they did object to Detective Caffey's qualification as an expert. The transcript tells a different story. To be sure, defense counsel asked the court at sidebar whether Caffey "[had] been qualified and declared an expert," but the court responded by reminding counsel that an expert designation need not be made on the record in front of the jury under *Johnson*, 488 F.3d at 698. Asking whether Detective Caffey had been qualified is not the same as objecting to his qualification. The court identified the controlling qualification procedure under *Johnson*, but defendants failed to follow it.

*Detective Caffey*. Defendants first argue that the district court failed to properly assess Detective Caffey's qualifications or formally certify him as an expert. But that argument misunderstands the process that this court blessed in *Johnson* for qualifying law enforcement experts. To prevent the jury from drawing any implicit note of approval from a court's certification of a witness as an expert, *Johnson* held that a court should not qualify a witness before the jury at the outset of testimony. "Instead, the proponent of the witness should pose qualifying and foundational questions and proceed to elicit opinion testimony. If the opponent objects, the court should rule on the objection, allowing the objector to pose *voir dire* questions to the witness's qualifications if necessary and requested." *Id.* at 697–98. Had defendants objected after Detective Caffey testified about his background and qualifications, then the court would have been required to rule on Caffey's qualifications and perhaps allow for *voir dire*. But the defendants did not object—even after the court identified *Johnson* as the governing

precedent. Defendants cannot now claim error, let alone plain error, because of their own failure to follow the proper procedure below.

Nor did the court abuse its discretion in admitting Detective Caffey's testimony as relevant expert opinion evidence under Federal Rule of Evidence 702. Detective Caffey was highly qualified: (1) he had served as an L.A. police officer for thirty-five years; (2) had spent most of his career working gang assignments, including twelve years in a gang surveillance unit; (3) had taken several specialized gang training courses; (4) had taught gang-related topics to law enforcement officials and others for twenty-five years; and (5) had testified about gangs and gang culture five times in federal court and something like five hundred times in state court. The district court sensibly noted that it "[could not] imagine too many people having more credentials."

Moreover, Detective Caffey's testimony about gang, and particularly Crip, culture was relevant and helpful to the jury in understanding the evidence about the Short North Posse, which the Government alleged to be a local "set" of the national Crips gang. Detective Caffey testified about the Los Angeles origins of the Crips and the proliferation of "Crip sets," or independent, neighborhood-specific offshoots, which though independent would often share a certain culture. He also reviewed and opined on photographs of graffiti found in the Short North area, which he identified as incorporating common Crips gang signs. At the same time, Detective Caffey made clear that he was not familiar with any gang sets in Columbus and was testifying "just generally [about] what you see nationally." In other words, Detective Caffey equipped the jury with an understanding of general Crips culture to help it determine whether the Short North Posse was a criminal enterprise.

As we said in *Johnson*,

[c]ourts generally have permitted police officers to testify as experts regarding drug trafficking as long as the testimony is relevant and reliable. . . . There are innumerable trades and practices that employ their unique devices, feints, and codes that may mean nothing to the untrained observer but may speak volumes to a maven qualified by experience or training.

*Id.* at 698. Testimony "regarding the inner-workings of organized crime" fits squarely within this category and thus is a "proper subject of expert opinion." *See United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000).

Notwithstanding Detective Caffey's general qualifications, defendants argue that his testimony was irrelevant and unreliable because he lacked specific knowledge about Columbus gangs. True enough, "a gang expert's testimony . . . is reliable only insofar as it is based on significant experience with the gang about which the expert is testifying." *See United States v. Rios*, 830 F.3d 403, 414 (6th Cir. 2016) (emphasis omitted). Thus, Detective Caffey would not have been a reliable expert on the Short North Posse itself. But he did not purport to be. Detective Caffey opined about the national Crips gang, on which he was qualified, and the Government used other testimony to show that the Short North Posse fit the description of a Crip set. This exact approach—eliciting expert testimony on a national gang and separately drawing a link to the local set—was approved of in *Rios*. *See id.* at 415. Arguments that this link was too tenuous go to the weight of Detective Caffey's testimony and not its admissibility. *See id.* at 415 n.1.

Finally, defendants argue that the Government violated Federal Rule of Criminal Procedure 16(a)(1)(G) by failing to provide a pre-trial summary of Detective Caffey's intended testimony. Defendants are correct that the Government breached its disclosure obligation, but that breach does not warrant relief. First, defendants did not object on these grounds below, so their claim is reviewed only for plain error. *See United States v. Faulkenberry*, 614 F.3d 573, 590 (6th Cir. 2010). Second, by failing to object below, defendants prevented the district court from curing the procedural notice violation with a less drastic remedy than requiring a new trial or precluding the evidence. The court could have, for instance, merely granted a continuance so that defendants had sufficient time to prepare for Detective Caffey's testimony. *See* Fed. R. Crim. P. 16(d). Finally, the Government's error did not seriously affect the fairness of the proceedings—and thus is not cognizable on "plain error" review—because defendants were on constructive notice that the Government intended to put on evidence of this sort. The court had indicated that gang-related expert testimony would be permissible from an appropriate witness, the Government stated on the record the day before his testimony that it would be calling

Detective Caffey as an expert, and the Government's witness list named him as a witness. Because defendants had constructive notice of Detective Caffey's testimony, the Government's failure to provide a summary of that testimony under Rule 16 was not plain error.

*Lieutenant Weir.*  Defendants also argue that the district court abused its discretion in permitting gang-related opinion testimony by Lieutenant Weir.  But again defendants failed to object on this ground below; thus, we review only for plain error.  The bulk of Lieutenant Weir's challenged testimony was permissible testimony about his own observations of gang-related activity in the Short North.  A review of the transcript pages that defendants cite shows that Lieutenant Weir testified about his own observations of gang graffiti in the Short North, gang signs thrown by members of that community, and photos of defendants and others wearing clothes or tattoos suggesting gang affiliation.  Lieutenant Weir's testimony arguably strayed into the realm of opinion—such as when he opined that the Short North Posse is a set of the national Crips gang—but permissibly so.  A non-expert witness is permitted to testify "in the form of an opinion" that is "rationally based on the witness's perception."  Fed. R. Evid. 701(a).  Lieutenant Weir's opinions about the Short North Posse were rationally based on his perception of the Short North Posse's activities and use of Crips-related gang signs during his time as a Columbus police officer.

On this record, defendants have not shown that it was plain error to admit Lieutenant Weir's lay-witness testimony on these subjects.  Lieutenant Weir's testimony was reasonably considered lay-witness opinion testimony, and much of his opinion testimony linking the Short North Posse to the Crips was duplicative of other testimony—including by former Posse members.  Defendants make much of the fact that the district court had previously ruled that Lieutenant Weir was unqualified to give expert testimony on national gang culture.  But that exclusion does not undercut the value of Lieutenant Weir's testimony stemming from his own experiences with the Short North Posse.  If anything, that the district court allowed this testimony despite its earlier order suggests that Lieutenant Weir's testimony was admitted and understood as proper lay-witness testimony, not improper expert testimony.

## D. Ledbetter's Sufficiency Claims

Ledbetter argues that there was insufficient evidence to convict him on any of the nine counts on which he was found guilty. In reviewing such a claim, we determine whether, after "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015) (quotation marks omitted); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This is a "very heavy burden" on a defendant, *Callahan*, 801 F.3d at 616, and Ledbetter has not carried it.

### 1. RICO Conspiracy

Ledbetter was convicted of RICO conspiracy, 18 U.S.C. § 1962(d), for his membership in the Short North Posse. Section 1962(d) makes it unlawful to conspire to associate with and participate in the conduct of an enterprise through a pattern of racketeering. *See* § 1962(c). Ledbetter concedes that the Short North Posse was a racketeering enterprise, as defined by § 1961, but contends that there was insufficient evidence that he agreed to participate in any RICO conspiracy. To establish a conspiracy to violate federal law, the Government need not "prove a formal agreement [to conspire], because a tacit or mutual understanding among the parties is sufficient to show a conspiratorial agreement." *See United States v. Gardiner*, 463 F.3d 445, 457 (6th Cir. 2006) (quoting *United States v. Bavers*, 787 F.2d 1022, 1026 (6th Cir. 1985)). Here, there was substantial evidence from which a rational jury could infer that Ledbetter conspired with his codefendants to engage in racketeering activity in association with the Short North Posse:

- Ledbetter had "Short North" tattooed on his chest;

- Ledbetter was a major supplier of drugs for others to sell in the Short North;

- Ledbetter regularly recruited other members and associates of the Short North Posse to commit murders and robberies;

- Ledbetter directed other Short North Posse associates to engage in criminal activity on his behalf, while he remained on the periphery;

- Ledbetter shared in the profits of the Short North Posse's criminal enterprise, and also shared the bounty with members who committed acts on behalf of the enterprise; and

- Ledbetter directed retaliation for acts of violence against Short North Posse members and for anyone who put the enterprise at risk by bragging or snitching.

In the face of this evidence, Ledbetter argues that he was never tied to minor street crimes of the kind that his codefendants committed, like one-off muggings and beatings. Even assuming that is true, it takes no account of all of the evidence linking Ledbetter to far more serious crimes on behalf of the Short North Posse. Indeed, that Ledbetter did not participate in so-called minor crimes is consistent with the Government's theory that Ledbetter was the head of the Short North Posse. Making all inferences in favor of the Government, a rational juror could find that Ledbetter formed a tacit RICO conspiracy to associate with and participate in the Short North Posse's affairs through a pattern of racketeering.

### 2. The Johnson Murder

Ledbetter also challenges his conviction for the murder of Alan Johnson in aid of racketeering, 18 U.S.C. § 1959(a). Ledbetter argues that the Government failed to prove that he was involved in Johnson's murder. Although Ledbetter may not have pulled the trigger, a rational juror could have found beyond a reasonable doubt that Ledbetter was sufficiently involved in Johnson's murder to be charged as a principal for that offense. "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2. That provision "reflects a centuries-old view . . . that a person may be responsible for a crime he has not personally carried out if he [knowingly] helps another to complete its commission." *Rosemond v. United States*, 572 U.S. 65, 70 (2014).

First, there was evidence of motive. Several witnesses testified that Ledbetter's brother was murdered two weeks earlier and that word on the street was that Johnson was responsible. Samantha Murphy testified that, shortly after his brother's death, Ledbetter told her that "he wants to take care of who killed his brother."

Second, there was direct evidence of Ledbetter's actions on the night of the murder. Murphy testified that Ledbetter and others were at her house when he received a call letting him know where Johnson was. Murphy testified that all of the men had guns and that, after receiving

the call, a few of the men donned black hoodies and then left. Although Murphy did not leave with Ledbetter, Anthony Jones (a Short North Posse member) testified that Ledbetter and Marcus Peters picked Jones up in a van, and that Jones then directed and accompanied Ledbetter and the others to the house where Johnson was killed. Jones testified that he showed them to Johnson's apartment; that Ledbetter and Peters exited the car with guns drawn and met Harris outside the apartment before entering; and that Jones heard gunshots before Ledbetter and Peters returned to the van. Johnson testified that Ledbetter paid him $3,500 for assisting in Johnson's murder.

Third, there was testimony by several witnesses who had indirect knowledge of what happened. Kenneth Slaughter, another Short North Posse member, testified that Peters (who died before trial) told Slaughter that Peters and Harris shot Johnson while Ledbetter accompanied them, in retaliation for the death of Ledbetter's brother. Earl Williams, who had also spoken with Peters about the Johnson murder, relayed that Peters, Ledbetter, and Harris "caught up with the dude [Johnson] inside of a place" and that Peters and Harris shot him dead. Troy Patterson, yet another Short North Posse member, testified that Harris had told him how he, Peters, and Ledbetter murdered Johnson, and that Ledbetter paid Harris and Peters $10,000 for the hit. Allen Wright, a former Short North Posse member, testified that he too heard about the murder from Harris, who admitted to killing Johnson along with Ledbetter and Peters. Ledbetter's girlfriend, Crystal Fyffe, before she was murdered (at Ledbetter's direction), told her attorney and mother that Ledbetter had killed the person who killed his brother. Finally, Murphy testified that Ledbetter proudly told her that he "took care" of Johnson and paid off Johnson's girlfriend for tipping him off on Johnson's location.

Ledbetter argues that this evidence is insufficient because none of the testifying witnesses had personal knowledge of what occurred, and because some of the stories—for instance Murphy's and Jones's versions of who directed whom to Johnson's house—are slightly inconsistent. But that argument ignores Jones's first-hand knowledge of the murder and presupposes an evidentiary eyewitness requirement that does not exist. "Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000) (quotation marks omitted). The jury was entitled to convict based on Jones's first-hand

account and the second-hand accounts of several witnesses, whose stories for the most part corroborated each other's. In effect, Ledbetter asks this court to do what it cannot: "reweigh the evidence, reevaluate the credibility of witnesses, or substitute our judgment for that of the jury." *See Callahan*, 801 F.3d at 616. Thus, his claim fails.

### 3. The Williams Murder

Ledbetter was convicted of two offenses for the murder of Rodriccos Williams: (1) murder in aid of racketeering, 18 U.S.C. § 1959(a)(1), and (2) murder with a firearm during a drug trafficking crime, 18 U.S.C. § 924(j). As with his prior claim, Ledbetter argues only that the evidence was insufficient to show that he was involved in Rodriccos Williams's murder; he does not challenge the evidence of any specific motivational or other element. There was substantial evidence linking him to this murder as well.

Again, there was evidence of motive. Michael Boyd, a strip-club proprietor, testified that Ledbetter visited his club a few weeks before the murder and expressed hostility toward Rodriccos Williams, who was apparently seeing Ledbetter's ex-girlfriend, Latonia Boyce. That night at the club Ledbetter told Boyd about how his crew, the Cut Throat Committee, hurt people. Out of fear for Rodriccos Williams and Boyce's safety, Boyd called and warned them not to come by the club while Ledbetter was around.

The jury heard a first-hand account of the murder from Earl Williams, who assisted Ledbetter in carrying it out. Earl Williams explained that Ledbetter had recruited him to help with the home invasion of Rodriccos Williams's house, so that he could keep an eye on the younger members joining them—Harris, Liston, and R.J. Wilson. According to Earl Williams, Ledbetter was on the phone with Boyce for intelligence as they approached the house; she said that Rodriccos Williams was arriving home soon, so they waited to ambush him at his door. When Rodriccos Williams arrived, the group charged the door. Harris, Wilson, and Liston struggled with Rodriccos Williams just inside; Earl Williams ran upstairs and robbed a woman at gunpoint; and Ledbetter oversaw the operation from the doorway. As Earl Williams was robbing the woman upstairs, he heard several gunshots—the shots that killed Rodriccos Williams—and returned downstairs before retreating back to the getaway car with the rest of the crew.

Earl Williams's account was corroborated by other evidence. Latonia Boyce agreed that she had spoken with Ledbetter by phone that night and told him that her husband and children were returning from a movie shortly before the ambush. Phone records back that up too. Boyce also confirmed that she was the woman in the upstairs bedroom who was robbed by Earl Williams. Rodriccos Williams's brother-in-law testified that he saw three masked, black-clad men barrel into the house with Rodriccos Williams, as Earl Williams had described, before shooting him to death. Crystal Fyffe (Ledbetter's girlfriend) told her attorney and law enforcement (before her murder) that Ledbetter had called to ask for directions to Rodriccos Williams's house earlier that day. Fyffe also apparently told her mother that she had disposed of some items for Ledbetter after the murder—items that Earl Williams identified as the black clothes and masks they wore.

There is more. Cell-site records placed Ledbetter in Pickerington, Ohio, near Rodriccos Williams's house, around the time of his murder. Plus, Ledbetter's own text messages and testimony by other witnesses showed that Ledbetter was later concerned that Earl Williams— who was in jail on other charges—was talking to the police about Rodriccos Williams's murder in hopes of cutting a deal.

According to Ledbetter, this mountain of evidence is insufficient because Earl Williams may have made up the story to scapegoat Ledbetter and cut a deal with police. But it is Ledbetter's own speculation that is insufficient. Even the "uncorroborated testimony of an accomplice" may support a conviction. *See United States v. Owens*, 426 F.3d 800, 808 (6th Cir. 2005) (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)). Here there was more. It was for the jury to believe or disbelieve Earl Williams, and they reasonably chose to believe him.

### 3. The Fyffe Murder

Ledbetter was also convicted of three crimes for the murder of Crystal Fyffe, his girlfriend turned cooperating witness: (1) murder in aid of racketeering, 18 U.S.C. § 1959(a)(1), (2) conspiracy to murder a witness, 18 U.S.C. § 1512(k), and (3) discharge of a firearm during a crime of violence, 18 U.S.C. § 924(c). Once again, Ledbetter argues broadly that there was

insufficient evidence that he was involved in the murder at all—he does not contest any specific motivational or other element. Although Ledbetter was in prison when Fyffe was murdered, there was, making all inferences in favor of the Government, sufficient evidence for a rational juror to find that Ledbetter orchestrated Fyffe's murder.

The evidence showed that Fyffe and Ledbetter had a violent relationship. Once, Ledbetter went so far as to tie Fyffe up and shoot her in the hand for threatening to leave him. In that same vein, the jury saw text messages between the two that could be read as death threats by Ledbetter after Fyffe confronted him about his infidelity. The evidence amply showed that Fyffe knew much about Ledbetter's criminal activity, and that Ledbetter suspected her of cooperating with law enforcement.

Ledbetter threatened Fyffe repeatedly for what he perceived as snitching, and Fyffe took those threats seriously. Before her death, Fyffe confided in her attorney that she was afraid Ledbetter or an associate would kill her, and even showed the attorney a letter in which Ledbetter threatened to kill her if she cooperated with police. Fyffe's mother testified that Fyffe had recounted her fear of a man, known as "Santa," who was a contract killer of Ledbetter's. Sure enough, in one of many threatening letters, Ledbetter wrote to Fyffe—in July—that "before you know it Santa Claus will be coming to town . . . I am sure not happy that I won't get to see these days in person." Ledbetter also intimated that he had circulated photos of Fyffe to fellow Short North Posse members so that they could find and kill her.

The circumstances of Fyffe's murder strongly suggest that Ledbetter followed up on his threats to have her assassinated. Fyffe was shot in the head outside her home as she returned with a pizza one evening. There were no witnesses, and though she had phones and keys on her, they were not taken—suggesting Fyffe's murder was neither a random act of violence nor a robbery gone bad, but a calculated killing.

The evidence against Ledbetter on these counts is entirely circumstantial, but circumstantial evidence alone can support a conviction. *Johnson*, 200 F.3d at 992. Ledbetter argues that it is possible, by considering various pieces of evidence, to draw conclusions different from those the jury drew. For example, he reads his letters and texts as the mark of a

heated lovers' quarrel, not as the thinly-veiled threats of a would-be executioner.  But that misses the point at this stage, where all inferences must be made in favor of the prosecution and the evidence need not "exclude every reasonable hypothesis except that of guilt."  *See id.* (quoting *United States v. Reed*, 167 F.3d 984, 992 (6th Cir. 1999)).  The evidence reasonably showed that Ledbetter had motive to kill Fyffe because of her cooperation with police, had ordered other targeted killings in the past, and had threatened Fyffe that he was sending one of his contract killers to murder her; that Fyffe feared for her life and conveyed those fears to her mother and attorney; and that Fyffe's murder was an assassination and not a random act of violence.  That is enough evidence of Ledbetter's guilt.

### 4.  The Brumfield Murder

Ledbetter was also convicted of murder in aid of racketeering, 18 U.S.C. § 1959(a)(1), and murder with a firearm during a drug trafficking crime, 18 U.S.C. § 924(j), for the death of Marschell Brumfield.  Ledbetter yet again argues that the evidence was insufficient to show that he was involved in the murder and, in doing so, challenges the credibility of the witnesses against him.  But credibility determinations are left to the jury, *Callahan*, 801 F.3d at 616, and a rational juror could have found sufficient evidence to convict Ledbetter for murdering Brumfield.

Troy Patterson, an unindicted coconspirator, testified that Ledbetter ordered Patterson, Liston, Ussury, Franklin, and Harris to rob Brumfield, and that the group shot Brumfield to death after the robbery went bad.  Patterson testified that Ledbetter guided the group to Brumfield's house and then parked nearby so that he could watch from "behind the scenes" without being seen.  Patterson and Harris were knocking on Brumfield's apartment door when Brumfield arrived home to what turned out to be an armed ambush outside his apartment.  The group ordered Brumfield to strip, but he fought back.  As Brumfield took a swing, Liston shot him three or so times in the stomach; as Brumfield fell to the ground, Ussury and Franklin fired three or four more rounds.  According to Patterson, Harris later explained to him that Ledbetter had ordered the robbery after witnessing Brumfield buy a large amount of drugs from one of

Ledbetter's dealers. Ledbetter had followed Brumfield home from the drug-buy so that he could later return with the hit-squad.

The jury could convict Ledbetter on Patterson's firsthand account of the robbery gone bad. Again, the "uncorroborated testimony of an accomplice" may support a conviction. *See Owens*, 426 F.3d at 808 (quotation marks omitted). Further, Patterson's account was corroborated by two neighbors who saw the encounter and its aftermath, respectively. Once again Ledbetter argues that the testimony was incredible yet concedes in the same breath that credibility is for the jury. *See United States v. Kessler*, 352 F.2d 499, 499 (6th Cir. 1965) (per curiam). Without more, Ledbetter has not shown that the evidence was insufficient.

### E. The Hill Murder

Ussury challenges his conviction for murder in aid of racketeering, 18 U.S.C. § 1959(a)(1), for the shooting death of Dante Hill. Specifically, Ussury argues that there was insufficient evidence that he (i) murdered Hill or (ii) did so for either of the two possible statutory purposes—in consideration for anything of pecuniary value from the enterprise (the "pecuniary gain" motivation) or to gain entrance to or maintain or increase his position in the enterprise (the "positional" motivation). § 1959(a). The evidence showed that Ussury murdered Hill. Though no one could identify the shooter, Ussury was supposed to be selling Hill drugs when Hill was shot during a drug deal, a witness and cell-site records put Ussury in the area, and two cooperating witnesses testified that Ussury admitted shooting Hill.

A rational juror could not, however, have found beyond a reasonable doubt that Ussury murdered Hill either for pecuniary gain *from* the Short North Posse or to boost his position within the gang. Whether Ussury planned to murder Hill from the start or resorted to murder only after the drug deal had gone bad, Ussury acted alone and without any apparent benefit to the Short North Posse. This was the work of a single person, who happened to be in a gang. To find sufficient evidence of racketeering purpose here would be to convert the violent-crimes-in-aid-of-racketeering statute into a gang-status crime, punishing any and all violent crimes by gang members, no matter their relation to a racketeering enterprise. That sweeps too broadly.

Tabib Broomfield, a drug dealer and friend of Ussury's, testified that he called Ussury on the day of the murder to ask if Ussury would drive over to Broomfield's house to sell marijuana to Hill, a regular buyer of Broomfield's. Broomfield was fresh out. Ussury said that he would try to make it. Hill's girlfriend, Casey Martin, accompanied Hill to Broomfield's house and waited in the car, parked in Broomfield's driveway, as Hill headed in to transact his business. Almost immediately, though, Hill was chased back to the car by a man in a black hoodie, who shot Hill before running off. Martin could not identify the shooter.

Broomfield was a few blocks away when Hill was shot, but returned to his house when he saw Ussury's car drive away while Hill's car remained in the driveway. Broomfield returned home to find Hill bleeding from a gunshot wound as Casey struggled to lift him into the car. Shocked, Broomfield called Ussury from his cell phone and headed to the Short North to see him. Over the phone, on Broomfield's way there, Ussury told him that "everything went bad." According to Broomfield, Ussury added that Hill "was trying to do something to him," which Broomfield found unlikely given Hill's small stature.

After shooting Hill, Ussury apparently drove to one of the houses frequented by Short North Posse members. According to Anthony Jones, who was at the house that night with a few fellow Posse members, Ussury told the group how he had tried to rob Hill at Broomfield's house but ended up shooting him after Hill reached for his gun. Ussury asked the group for help getting rid of the gun. Troy Patterson testified that Ussury had also recounted to him how Ussury was supposed to do a weed deal with a guy at Tabib Broomfield's house but "ended up robbing him, shooting him, and killing him."

Although this evidence—most pointedly, Ussury's admissions—showed that Ussury murdered Hill, it did not show beyond a reasonable doubt that Ussury did so for one of § 1959(a)'s statutory purposes.

*Pecuniary Gain.* The Government's first account of the facts is that from the beginning Ussury agreed to the drug deal only as a ruse to rob Hill—a plausible story to be sure. According to that view, Ussury robbed and murdered Hill for something of pecuniary value— Hill's money. But § 1959(a) requires consideration of pecuniary value "from the enterprise," not

from the victim. Thus, as the Government concedes, this account does not fit the classic "murder for hire" narrative, where an enterprise pays someone to rob or kill a specific target. Instead, the Government relies on an "enterprise profits" theory of the pecuniary-gain motivation. The Government reads § 1959(a) to cover a violent crime committed in the course of enterprise-related work so long as the person expects to profit from the overall affairs of the enterprise. One example would be an organization where members pool the profits from individual robberies and then each takes a cut or draws a salary of sorts from the organization's overall profits. Any particular robbery would garner pecuniary gain directly *from* the victim, but viewed collectively the robberies would increase the profits of the enterprise—and the robber would take his share *from* the enterprise.

The "enterprise profits" theory of pecuniary gain is a sound one, but it does not fit the facts of this case. There is no evidence that Ussury intended to split whatever he got from Hill with others in the Short North Posse. Nor is there any evidence that he robbed (and killed) Hill in the course of his Short North Posse work—this was not the sort of robbery that the Short North Posse regularly conducted as part of its affairs. Unlike the other Short North Posse robberies the jury learned of, this one was conducted alone, without assistance or direction from any of Ussury's fellow members, and targeted a smalltime drug user rather than a competing drug dealer, deep pocket, or rival gang. If anything, robbing and killing a smalltime buyer needlessly risked exposing the enterprise for an inconsequential amount of money. Ussury's one-off robbery and murder of Hill did not contribute to the purpose of the group and thus is not attributable to the enterprise. *Cf. United States v. Odum*, 878 F.3d 508, 517 (6th Cir. 2017) (citing *United States v. Feliciano*, 223 F.3d 102, 117 (2d Cir. 2000)), *vacated on other grounds sub nom Frazier v. United States*, 139 S. Ct. 319 (2018). Thus, this is not an appropriate case for the "enterprise profits" theory of pecuniary gain.

Our decision in *United States v. Holt*, 751 F. App'x 820, 826–27 (6th Cir. 2018), albeit unpublished, provides a useful contrast. Holt made similar arguments against his conviction for murder in aid of racketeering after the robbery of a drug dealer devolved into murder. *See id.* He argued that the prosecution did not prove an "enterprise profits" theory, because the robbery was not a Short North Posse job, but a "side hustle" unrelated to the enterprise. The evidence

showed otherwise. The robbery was planned by a man named Lance Reynolds, a Short North Posse member responsible for orchestrating robberies of rival drug dealers. *Id.* at 821. Reynolds often relied on associates, including Holt, from other neighborhoods to help carry out these robberies. *Id.* Others testified that Holt served as an "aggressor" during several of these jobs and had received a cut of the profits for his work. *Id.* at 821–22. "Given that the Short North Posse often engaged in robberies, particularly of drug dealers, and given that one participant in [this] robbery had characterized the robberies he committed with Reynolds as ones he committed with the Short North Posse, a rational jury could conclude" that this was a Short North Posse robbery and that Holt participated to gain something from the enterprise—a cut of the proceeds. *See id.* at 827.

The evidence in *Holt* showed what is missing here: that the robbery was undertaken on behalf of the Short North Posse, such that the ill-gotten fruits of that labor might be attributed to the enterprise. Without evidence linking Ussury's actions to the Short North Posse's affairs, a rational juror could not conclude beyond a reasonable doubt that Ussury robbed and killed Hill in consideration for something of pecuniary value from the enterprise.

*Positional Motivation.* The Government relies in the alternative on the second statutory purpose, arguing that Ussury was motivated to rob and kill Hill in order to maintain or increase his position in the Short North Posse. A jury can reasonably infer that motive where the evidence shows that a defendant committed the violent crime "because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *See United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992). But the evidence did not show that here. While there was plenty of evidence that Short North Posse members were expected to be violent and take part in sanctioned robberies and murders, there was no evidence that members were expected or encouraged to unilaterally rob and murder low-level drug users who otherwise supported the gang by purchasing its drugs.

It is not enough that Ussury committed a violent crime while a member of a violent gang. The violent-crimes-in-aid-of-racketeering statute does not extend to every "violent behavior by a gang member under the presumption that such individuals are always motivated, at least in part,

by their desire to maintain their status within the gang." *United States v. Hackett*, 762 F.3d 493, 500 (6th Cir. 2014) (quoting *United States v. Banks*, 514 F.3d 959, 968 (9th Cir. 2008)). The statute requires that an "animating purpose" of the defendant's action was to maintain or increase his position in the racketeering enterprise. *See Hackett*, 762 F.3d at 500. This would be a different case entirely if the Short North Posse directed Ussury to rob and murder Hill, or if Hill was somehow a target of the gang. If so, a reasonable jury could infer that Ussury carried out a Short North Posse job because it was expected of him as a member. But unlike in those hypotheticals or in any of the Government's cited cases, one is left to guess why Ussury acted as he did here—alone and with no apparent connection to the gang. Guesswork is not reasonable inference.

The facts of the two cases relied on by the Government show the difference between the reasonable inferences drawn by the juries in those cases, and the improper speculation needed here to arrive at the statutory purpose. In *United States v. Dixon*, a gang member was convicted of assault in aid of racketeering for a robbery he committed with a fellow gang member. 901 F.3d 1322, 1343 (11th Cir. 2018). Cooperating witnesses testified that the gang's drug money came from robberies and that a member would lose respect if he refused to help with a robbery. *See id.* On the night in question, the defendant and his accomplice left for this robbery "mission" from one of the gang's hideouts and returned back there after it was completed to brag about their exploits. *See id.* at 1333. Thus, the jury reasonably concluded that the robbery was sanctioned by the gang and that the defendant participated because he knew it was expected of him as a member. *See id.* at 1343. Had Ussury robbed Hill along with or at the direction of fellow Short North Posse members, or had the robbery fit the mold of the gang's typical missions against rival dealers and gangs, then this would be a different case. But as it stands, the evidence draws no reasonable connection between the robbery and the gang's affairs.

*United States v. Odum* is also distinguishable. 878 F.3d 515, 519 (6th Cir. 2017). In *Odum*, a motorcycle-gang member was convicted for shooting two rival gang members during a barfight that broke out at the rival gang's clubhouse. *Id.* at 519. The defendant joined the fight in defense of a fellow member and immediately afterward reported his actions to gang leadership, so that they could prepare for the likely fallout. *See id.* We held that a rational juror

could find that the defendant's "violent defense of fellow gang members was undertaken to preserve standing in the gang when the gang 'expected its members to retaliate violently when someone disrespected or threatened a fellow member.'" *Id.* (quoting *United States v. Gills*, 702 F. App'x 367, 376 (6th Cir. 2017)).   The Government urges the same result here— suggesting that Ussury's statement that "everything went bad," could be construed to mean that Hill attacked Ussury, and Ussury retaliated as was expected of a Short North Posse member.  But there is nothing but speculation behind this suggestion.  Unlike in *Odum*, there is no evidence from which a rational juror could reasonably infer that Ussury took this action because the gang expected it of him.

At bottom, the evidence of Ussury's motivation was thin, and whatever evidence there was does not support a *reasonable* inference that Ussury robbed and murdered Hill for one of the two statutory purposes.  The evidence did not show that this was a Short North Posse robbery, nor that Ussury committed a solo act of violence to boost his reputation within the gang.  It is not enough that a violent gang member did a violent thing.  Ussury's conviction on this count cannot stand.

## F.  The Moon Murder

Harris and Robinson were each convicted of several crimes for their involvement in an armed home-invasion robbery that led to the death of Donathan Moon.  They raise various challenges to their convictions of murder in aid of racketeering, 18 U.S.C. § 1959(a)(1), and murder by firearm during a crime of violence, 18 U.S.C. § 924(c), (j).

The evidence showed that in August 2007 Rastaman Wilson, David Hurst, Robinson, and Homicide Squad members Harris and R.J. Wilson conducted an armed home invasion at Greg Cunningham's house, which doubled as a strip club and event space.  Harris broke down the door, and the others began the assault.  As Robinson charged through the battered door, he saw Donathan Moon, a guest of Cunningham's, bolt into a bedroom and shut the door behind him. Robinson followed and fired three rounds from an AK-47 assault rifle through the door.  Once Robinson's shots were fired, R.J. Wilson entered the bedroom and shot Moon to death with a

handgun.  Robinson, Harris, and the others searched the house for the cash they were hoping to find, but found none and left.

The evidence supported two possible theories as to who initiated the robbery and why: either Robinson discovered that Cunningham kept large sums of money at his house/business and enlisted the Short North Posse to help steal the money in exchange for a cut of the loot, or Robinson was conscripted by the Short North Posse for the same purpose.  Either way, the evidence showed that Cunningham often had large sums of cash at home because he ran his illegal entertainment business from there, and that the group was after that stash.  One associate, David Hurst, testified that he agreed to be the getaway driver in exchange for a couple thousand dollars of the expected purse.  From this, and the Short North Posse's customary splitting of robbery profits, the jury could have inferred that Harris and Robinson also expected to receive a cut of the proceeds in exchange for their service.

### 1. Robinson's Identity Claim

Robinson argues that there was insufficient evidence that he was involved in the robbery. However, he concedes the evidence showed that someone by the nickname "Tink" was involved and also that he went by "Tink."  So Robinson is left to speculate that someone else with the nickname "Tink" must have participated.  This is conjecture passing for argument.  Two witnesses identified Robinson in court as the Tink that was involved in the murder.  Both witnesses also identified characteristics of the Tink they knew, which matched Robinson— details like where his mother lived and that his first name was Clifford.

Robinson argues that all of this is insufficient because both witnesses who made in-court identifications had misidentified Robinson in photo arrays displayed to them during the earlier investigation.  The Government counters that the photo of Robinson in the arrays was difficult to recognize.  Regardless, it was for the jury to weigh those misidentifications against the in-court identifications and other identity evidence.  *See Callahan*, 801 F.3d at 616.  This court cannot now disturb those evidentiary determinations.

**2. Evidence of Racketeering Purpose**

Harris and Robinson were each convicted of murder in aid of racketeering, 18 U.S.C. § 1959(a)(1), for the murder of Donathan Moon. Each argues that there was not sufficient evidence that he committed the murder for one of the two possible statutory purposes—for pecuniary gain from the Short North Posse, or to increase their position within the gang. § 1959(a). But the jury was entitled to infer that Harris and Robinson participated in the robbery for pecuniary gain—to split the cash they were expecting Cunningham to have kept at his dual home/business venue. The jury could also infer that, since this was a bread-and-butter Homicide Squad robbery, any cash they stole amounted to enterprise profits, a cut of which they hoped to receive—from the enterprise. This is a proper application of the "enterprise profits" theory of pecuniary gain. As this court held in connection with an earlier Short North Posse appeal, "[h]aving concluded that this was a Short North Posse robbery, a rational jury could also conclude that [defendants] participated in the robbery to gain something of pecuniary value from the gang." *See Holt*, 751 F. App'x at 827.

Robinson argues that this theory cannot apply to him, because he was not himself a member of the Short North Posse enterprise. That is immaterial: Section 1959(a) is not limited to enterprise members. On the contrary, the pecuniary-gain prong paradigmatically covers actions by so-called independent contractors who perform violent crimes for or alongside an enterprise for profit. *See Concepcion*, 983 F.3d at 384. In fact, the defendant in *Holt*, 751 F. App'x at 821, was an outside associate as well.

**3. Crime of Violence**

For their participation in the Cunningham home invasion and Moon murder, Harris and Robinson were also convicted of murder by firearm during a crime of violence, 18 U.S.C. § 924(c), (j)(1). Here, the purported "crime of violence" was conspiracy to commit Hobbs Act robbery, which makes it a crime to conspire to "in any way or degree obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce, by robbery." 18 U.S.C. § 1951(a). Section 924(c)(3) defines "crime of violence" in two ways, but the parties agree that conspiracy to commit Hobbs Act robbery qualifies only if it meets § 924(c)(3)(B)'s

residual definition.  By that definition, a "crime of violence" is a felony offense "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  § 924(c)(3)(B).

Harris and Robinson argue that their convictions under § 924(c) must be set aside because § 924(c)(3)(B)'s residual clause is unconstitutionally vague.[1]  The Supreme Court has now held that § 924(c)(3)(B)'s residual definition is unconstitutionally vague.  *See United States v. Davis*, No. 18-431, __ S. Ct. __, 2019 WL 2570623 at \*13 (June 24, 2019).  Because the Government relies only on that now-invalidated clause to support Harris's and Robinson's convictions under § 924(c), those convictions must be set aside.

### G.  Improper Testimony About Ledbetter's Lawyer

Next, Ledbetter and Liston contend that the district court abused its discretion by not declaring a mistrial after two prosecution witnesses implied on the stand that Ledbetter's attorney had engaged in improper (and, in one case, even criminal) acts.  Although these statements were inappropriate, the court reasonably determined that a mistrial was not necessary and instead issued appropriate curative instructions.

The first statement came out during the Government's direct examination of Earl Williams, a cooperating codefendant.  Williams testified that Ledbetter's attorney had, at Ledbetter's direction, visited Williams in prison to encourage him to fire his attorney (for whom Ledbetter was paying) and hire Ledbetter's own attorney instead (also on Ledbetter's dime).  Williams stated that Ledbetter's attorney "question[ed him] like a detective . . . to figure out what [he had] shared with [his] lawyer already."  Reading between the lines, Williams's testimony suggested Ledbetter might have been using his attorney to learn whether Williams was talking to police.  Defendants objected and, out of the jury's presence, argued that the testimony insinuated that Ledbetter's counsel was improperly doing Ledbetter's bidding.  The court concluded that the testimony was probative of Ledbetter and Williams's membership in a

---

[1]Harris and Robinson argue also that the Government failed to prove that the robbery conspiracy interfered with interstate commerce.  Because their § 924(c) convictions must be vacated regardless, we need not decide whether the Government sufficiently proved the necessary interstate-commerce nexus for conspiracy to commit Hobbs Act robbery.

conspiracy. Appreciating, however, that the testimony might also be construed to implicate Ledbetter's attorney in wrongdoing, the court instructed the jury

> to disregard that portion of Mr. Williams' testimony wherein he testified that [Ledbetter's counsel] had questioned him like a detective. I'm excluding that because I find that that testimony is more prejudicial to the defendants than probative . . . of any of the issues in this case under the applicable federal laws under which this case is being tried. I will further advise the jury that you are not to infer from the fact that [Ledbetter's counsel] spoke with Mr. Williams that [Ledbetter's counsel], himself, was either a co-conspirator or was acting in furtherance of any conspiracy. Finally, I will advise you that, as lawyers, we are required, in interviewing clients or p[ro]spective clients, to ask probing questions, and sometimes challenging questions, in properly discharging our responsibilities of zealous representation. And those probing questions can often appear to be detective-like in nature, because you're trying to probe to make sure that your client's rendition of the facts makes sense and would withstand scrutiny.

The second incident happened the following day, during cross-examination of Anthony Jones, another cooperating codefendant. In an attempt to discredit Jones's damning testimony, Ledbetter's attorney cross-examined Jones about his plea deal and also elicited a concession that Jones had lied to the grand jury about some details. Ledbetter's attorney punctuated his line of questioning by asking, "There's no reason any reasonable person would believe a word that you say, correct?" Presumably upset, Jones responded, "Would they believe if I say that you gave information that probably got Crystal [Fyffe] murdered?" Harris's counsel objected immediately, and at sidebar everyone agreed that Jones's testimony was improper. Back before the jury, the court struck Jones's testimony as unresponsive and instructed the jury "to disregard the previous answer as it has no basis in fact or otherwise." At the end of Jones's testimony, the court reaffirmed its prior instruction:

> Ladies and gentlemen, before we bring in the next witness, I want to reiterate to you, after Mr. Jones's testimony, that you are to completely disregard the answer that he gave to [Ledbetter's counsel] about some information somehow being related to Ms. Fyffe's murder. I want to emphasize to the court that [Ledbetter's counsel] has never, in this Court's opinion and the evidentiary record will reflect, engaged in improper conduct and that any inference to that effect that was created by Mr. Jones's testimony must be completely disregarded by you as a matter of law.

The following morning, the court orally denied defendants' motions for a mistrial. The court found that any prejudicial comments about Ledbetter's attorney were isolated and unlikely to mislead the jury; that there was no evidence of bad faith by the Government; that the strength of the evidence against defendants was substantial; and that the limiting instructions cured any risk that defendants' rights were impaired.

Although both statements were improper, defendants have not shown that the testimony was so clearly prejudicial that any risk of harm was not cured by the court's thorough limiting instructions. To determine whether improper testimony causes incurable prejudice, the court considers five factors: "(1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether the limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant." *Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003).

For both improper statements, all five factors weigh against a mistrial. First, both remarks were unsolicited. Second, Jones's improper testimony came out on cross-examination by defense counsel (not direct by the Government), and the court reasonably found that the Government's questions to Williams about his interactions with Ledbetter's counsel were relevant (and thus reasonable). Third, the court immediately instructed the jury to disregard both statements and later reiterated those instructions in clear and forceful language. These instructions were especially curative because the court not only told the jury to disregard the evidence but explained that the stray comments had no basis in fact. Fourth, the court found no evidence of bad faith by the Government, and defendants have offered none. Fifth, defendants give no reason to disregard the court's finding that the statements were isolated and thus unlikely to cause prejudice in light of the substantial evidence of guilt adduced over two months of trial.

In sum, defendants have not shown that the improper statements were so clearly prejudicial that any risk of harm was not cured by the district court's forceful limiting instructions.

## H.  Liston's Tattoos

Liston claims that the district court abused its discretion in admitting photos of his "plainly visible" tattoos and not ordering a mistrial after the Government misstated in closing that Liston has a Homicide Squad tattoo on his chest, which he does not.  Neither claim requires reversal.  The district court was well within its discretion to admit the photos and cured any risk of prejudice from the Government's mistake by issuing an appropriate limiting instruction.

*Plainly Visible Tattoos.*  The district court did not abuse its discretion in allowing the Government to introduce six photos depicting gang-related tattoos on Liston's face, hands, and arms.  Liston's sole argument is that these photos were unfairly prejudicial—in other words, that their risk of prejudice substantially outweighed their probative value under Federal Rule of Evidence 403.  This is, by its nature, a tough argument to win on appeal because the district court has "very broad discretion" in balancing prejudice and probative value.  *See United States v. Mack*, 258 F.3d 548, 555 (6th Cir. 2001).  Here, the argument fails at the outset because the tattoos were directly relevant to a central issue in the case—Liston's membership in the Short North Posse and its Homicide Squad subsidiary.  Liston's tattoos included commemorative markings with the letters "R.I.P" and nicknames of deceased Short North Posse members, along with a verse that began, "Homicide part one."  We have held that gang tattoos "may be highly probative of an individual's membership in a particular gang" and thus are properly admissible "in cases where the interrelationship between people is a central issue," such as where a RICO conspiracy is alleged.  *See United States v. Rios*, 830 F.3d 403, 421 (6th Cir. 2016).

Liston relies on *United States v. Newsom* for the contention that gang-related tattoo evidence is unfairly prejudicial when it suggests a hostile, criminal disposition.  452 F.3d 593, 603–04 (6th Cir. 2006).  But Liston misreads *Newsom* to suggest that gang tattoos are necessarily unfairly prejudicial.  That cannot be right.  Rule 403 calls for a balancing, and in *Newsom*, a gun possession case, we held that the defendant's gang tattoos "were simply not probative" of the only issue in the case—whether he possessed the gun.  *See id.* at 603.  That violent gang tattoos were unfairly prejudicial where they had no probative value says nothing about the appropriate balancing in this case, where the tattoos had strong probative value on a key issue.

*Government's Misstatement.*   Liston is correct that the Government in closing misstated that Liston "has homicide for the cash tattooed on his chest," but incorrect to suggest that the court's curative instruction did not remedy any risk of prejudice.   At sidebar following defense counsel's objection to the misstatement, the Government asserted confidently that its first witness, Allen Wright, testified about Liston's chest tattoo; defense counsel disagreed.   In fact, the Government was mistaken:   Wright testified that Liston's older brother, not Liston, had a "homicide" tattoo on his chest.   But because the court was unsure of the testimony and thus loath to instruct the jury one way or the other, it charted a middle path:

> Ladies and gentlemen, as I previously admonished you, you are to rely on your combined, collective memories, as I advised both [the prosecutor] and [defense counsel] at side-bar.   They're both officers of the court and they heard what they both believe they heard.   I don't have a transcript with me, but I do rely on your collective memories to separate the wheat from the chaff.

Liston's counsel did not object to this instruction.

Liston has not shown that the Government's misstatement sank to the sort of prosecutorial misconduct that would warrant a new trial.   When the prosecution misstates material evidence, courts generally consider four factors in deciding whether the impropriety was so flagrant that it requires reversal:   (1) whether the remarks tended to mislead the jury or prejudice the defendant, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally made, and (4) whether the evidence against the defendant was strong.   *See United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001).   Here, at least three of the four factors lean strongly in the Government's favor:   the remark was both isolated and accidental (the court found as much and Liston does not argue otherwise), the evidence against Liston was strong (two people had testified directly that Liston was a member of the Homicide Squad), and several witnesses testified about his participation in two charged murders on behalf of the gang.   *See id.* at 783.   As for any tendency to mislead the jury or prejudice Liston, the court's instruction cured or at least minimized any damage.   This court "[o]rdinarily . . . should not overturn a criminal conviction on the basis of a prosecutor's comments alone, especially where the district court has given the jury an instruction that may

cure the error." *See id.* at 787. Liston's mere assertion that the Government's misstatement was harmful to the point of substantial prejudice does not make it so.

## I. Ineffective Assistance of Counsel

Ledbetter alone maintains that his counsel was constitutionally ineffective, but generally "a defendant may not raise ineffective assistance of counsel claims on direct appeal, since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations." *See United States v. Martinez*, 430 F.3d 317, 338 (6th Cir. 2005). Ledbetter insists that because this was a "massive, months['] long, complicated trial with over 100 witnesses and an enormous record," the record must be adequate to assess the merits of his claim. But a long and complicated trial record cuts the other way entirely. Thus, we decline to hear Ledbetter's claim of ineffective assistance of counsel on this direct appeal.

## J. Unanimity of Verdict

Harris, Liston, and Ussury were each convicted on at least one count of murder in aid of racketeering, which, again, requires that the murder was committed either as consideration for anything of pecuniary value from a racketeering enterprise or to gain entrance to or maintain or increase position in a racketeering enterprise. 18 U.S.C. § 1959(a). Due process requires that a federal jury "unanimously find[] that the Government has proved each element" of a crime, *Richardson v. United States*, 526 U.S. 813, 817 (1999), which the parties understand to mean that, for each conviction, the jury's verdict had to be unanimous as to which purpose was proven. The district court agreed and instructed the jury that "[t]he government need only prove that the [murder in aid of racketeering] was committed by the defendant for either one of two stated purposes, but your verdict must be unanimous as to which purpose."

The defendants were satisfied with that instruction below but now argue that due process required that the jury specify on a special verdict form which motive they unanimously found. Otherwise, defendants postulate, the jury may not have unanimously found one statutory purpose. Defendants fail, however, to cite a single case suggesting that a special verdict form is required in these circumstances. Because their claim is reviewed only for plain error, that failing is fatal.

The one case that defendants do point to, *United States v. Dale*, 178 F.3d 429 (6th Cir. 1999), is distinguishable. Dale was convicted by general verdict of conspiracy to distribute drugs. *Id.* at 430. The government's theory was that Dale distributed both cocaine and marijuana, but the jury needed to find only that he distributed at least one of the two. As here, the jury had to find unanimously which drug (or drugs) Dale conspired to distribute. The jury returned a general guilty verdict, which did not specify whether the jury based its conviction on Dale's distribution of cocaine or marijuana. *See id.* at 431. The district court then took it upon itself to find that Dale conspired to distribute cocaine and sentenced Dale above what would have been the statutory maximum for a marijuana-based conviction. We held that it was plain error to sentence Dale beyond the marijuana-based statutory maximum when it was impossible to know, without a special verdict, whether the jury found Dale guilty of conspiring to distribute marijuana or cocaine. *See id.* at 434. The *Dale* court relied by negative inference on language in *Edwards v. United States*, 523 U.S. 511 (1998), indicating that *Edwards* would have come out differently if "the sentences imposed exceeded the maximum that the statutes permit for a cocaine-only [as opposed to crack] conspiracy."

The difference between *Dale* and *Edwards* marks the rule: a special verdict is required when a finding of one alternative element over another is used to enhance a sentence beyond what would otherwise be the statutory maximum. This makes sense when the district court must determine which of two facts the jury found in order to determine the maximum sentence. That is not the case where, as here, it makes no sentencing difference which statutory purpose the jury found. Accordingly, the district court did not err.

### K.  Cumulative Error

Ledbetter and Liston argue cursorily that the cumulative effect of the trial errors they allege rendered the trial fundamentally unfair, even if each error alone would have been harmless. But neither has shown an error, and the "accumulation of non-errors" does not amount to reversible cumulative error. *See United States v. Underwood*, 859 F.3d 386, 394 (6th Cir. 2017). Thus, their claim of cumulative error fails for want of error.

**L.  Sentencing of Ledbetter**

Ledbetter also challenges his sentence.  First, he argues that he was convicted of multiple crimes and sentenced to multiple punishments for the same conduct, in violation of the Double Jeopardy Clause.  Ledbetter was convicted of multiple crimes for each of the three murders he committed.**²**  But he concedes that "applying the *Blockburger* test, these various counts do have elements not contained in the other."  Thus, under *Blockburger v. United States*, 284 U.S. 299 (1932), these offenses are different and Ledbetter can be punished for all of them without offending the Double Jeopardy Clause.

Ledbetter tries to wriggle out from under *Blockburger* with the help of *Rashad v. Burt*, in which this court acknowledged that the *Blockburger* test is not applicable to successive prosecutions.  108 F.3d 677, 679 (6th Cir. 1997).  But *Rashad* specifically relied upon the distinction between successive prosecutions for conduct that may constitute the same "act or transaction" and cases (like Ledbetter's) not involving successive prosecutions where the concern is "multiple charges under separate statutes," *id.* at 679, and where *Blockburger* applies. The holding of *Rashad*, moreover, has repeatedly been limited by this court to the particular facts of that case.  *See United States v. Farah*, 766 F.3d 599, 607 (6th Cir. 2014); *Murr v. United States*, 200 F.3d 895, 901 (6th Cir. 2000); *United States v. Forman*, 180 F.3d 766, 769–70 (6th Cir. 1999).

Second, Ledbetter contends that the district court erred in applying the leadership enhancement to his sentence under the Sentencing Guidelines.  U.S.S.G. § 3B1.1.  The court's application of that enhancement warrants deference, *see United States v. Washington*, 715 F.3d 975, 983–84 (6th Cir. 2013), and Ledbetter's only argument is to note his disagreement with the jury's verdict on the underlying charges.  There is no basis to hold that the district court misapplied the enhancement.

---

**²**Ledbetter was convicted of murder in aid of racketeering, 18 U.S.C. § 1959(a)(1), and murder through use of a firearm in relation to a drug-trafficking crime, 18 U.S.C. § 924(c), (j), for the murders of Rodriccos Williams and Marschell Brumfield; and for murder in aid of racketeering, conspiracy to murder a witness, 18 U.S.C. § 1512, and use of a firearm in relation to a crime of violence, 18 U.S.C. § 924(c), (j), for the murder of Chrystal Fyffe.

**III.**

For these reasons, we vacate Ussury's conviction and sentence on count eleven, for the murder of Dante Hill in aid of racketeering, 18 U.S.C. § 1959(a)(1), and Harris's and Robinson's convictions and sentences on count six, for the murder of Donathan Moon through use of a firearm during and in relation to a crime of violence, § 924(c), (j)(1). We remand those three defendants' cases solely for entry of judgment and consideration of whether resentencing on their remaining convictions is necessary. We affirm the remaining convictions and sentences.